11 CV 6644

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIZA HERNANDEZ,<br>Plaintiff,<br><br>vs.<br><br>CITY OF NEW YORK and<br>NEW YORK CITY OFFICE OF<br>CHIEF MEDICAL EXAMINER;<br>ASHIE HENRY,<br>Defendants. | Docket No. __________<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Liza Hernandez, pro se, as and for her complaint against defendant the City of New York and its Office of Chief Medical Examiner (the "City"), and Ashie Henry, alleges, upon knowledge as to herself and otherwise upon information and belief, as follows:

RECEIVED
SEP 16 2011
PRO SE OFFICE

## PARTIES

1. Plaintiff Liza Hernandez is an individual resident of the County of New York, City and State of New York.

2. The defendant Ashie Henry is an individual resident of the City and State of New York, whose place of business is also the City of New York.

3. The defendant City of New York is a municipal corporation created and existing under the laws of the State of New York, amenable to suit in its own name herein under the provisions of the New York City Administrative Code and Charter.

## JURISDICTION AND VENUE

4. This court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to the Americans with Disabilities Act, 42. U.S.C. § 12101 et seq., and 28 U.S.C. § 1331.

5. This court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

6. The City of New York is not a state office, so the Eleventh Amendment does not bar this court's jurisdiction over the defendant.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendant City does business in this District, and Defendant Ms. Henry resides in this District.

## STATEMENT (

**A. From the Beginning, Ms. Hernandez F**
**Expectations at the Office of the Chief**

RECEIVED
SEP 16 2011
PRO SE OFFICE

8. The Plaintiff Liza Hernandez began e

Office of the Chief Medical Examiner ("OCM

9. The Plaintiff had an excellent working

Ashie Henry for the first eight weeks of empl ... is naturally self-motivated, and immediately began taking on additional assignments to help the efficiency of the office. With Ms. Henry's approval, Plaintiff began updating and replacing outdated phone lists, typed instructions for coworkers to eliminate conflicts, suggested methods to increase efficiency (which were implemented) in regards to handling homicide case files, and updated NYC OCME Records

Department's method of maintaining and tracking archived case files. All this Plaintiff did of her own volition, from her desire to contribute and help. All was done with Ms. Henry's approval, but the impetus came from Plaintiff. Needless to say, all these projects were far above and beyond the actual requirements of her position.

10. On top of that, beginning in July 2008, Plaintiff took the initiative to learn a new software program and utilized that skill to increase speed and efficiency in department operations as well as train her coworkers on the new software. Ms. Henry instructed her to train staff on Microsoft Excel so that they would be able to work with the new spreadsheets that Plaintiff created.

11. In addition to these projects for the benefit of the department, Plaintiff's regular responsibilities were to handle the subpoenas, homicide case file requests, oversee the department activities, and comply with any instructions she was given by Ms. Henry.

12. Within six weeks of starting Plaintiff had figured out ways to immensely improve the efficiency of the process by which other City agencies request files from OCME. During a meeting in September 2008 regarding the Certification of Business Records, Plaintiff explained to Ms. Henry that it was not necessary to mail duplicate case files to the District Attorney's office. Plaintiff had discovered that duplicate files were being sent because the first copy went out without the Certification of Business Record. By implementing a change in procedure so each file was sent only once, Plaintiff explained, the department could save significant time and paper.

13. Plaintiff figured out other ways to improve the efficiency of the department as well, and prepared a report explaining her suggestions for improvement, including the utilization of software to replace outdated logbooks.

14. Plaintiff was, until the harassment began in September 2008, an uncommonly valuable employee.

## B. Ms. Hernandez's Disabilities and Accommodations

15. Plaintiff suffers from several disabilities. She has hearing loss in her left ear due to a perforated eardrum and chronic ear infections. The hearing loss itself is not debilitating, however the problem with that ear causes "positional vertigo."

16. The only accommodation Plaintiff needed was that she not be asked to climb ladders nor lift heavy boxes, as it is dangerous because the positional vertigo can lead to severe dizziness, causing her to fall and injure herself.

17. In addition the infections require more frequent than normal visits to the doctor for treatment. Plaintiff sometimes had to come to work with cotton in her left ear.

18. Due to her ear problem and a slightly twisted left leg, Plaintiff sometimes bobs when she walks. While this is noticeable it in no way interferes with her ability to work.

19. Plaintiff also suffers from severe daily migraine headaches.

20. Plaintiff suffered an unfortunate accident in 1998 when her right hand was caught in an elevator, causing permanent damage. As a result it was difficult for her to use the City Time Hand Scanner. As a final accommodation she requested and was initially allowed to use standard paper timecards instead.

21. Ms. Henry told Plaintiff that she would have to bring in a doctor's note and that she would submit it for approval. She said that it would not be a problem, and that indeed two other employees already used paper timecards due to their disabilities.

22. In August 2008 Plaintiff submitted doctor's notes for both the vertigo and the hand injury as requested, and the accommodations were granted.

23. Plaintiff punched the timecard upon arrival in the morning and again upon departure at the end of the day. At the end of the week, the timecard was signed and approved.

24. Medical notes were always required for time off.

25. Plaintiff had a meeting with Ms. Henry in July 2008, when she first began employment, to discuss her disabilities and the accommodation she would need not to climb ladders or carry heavy boxes or multiple case files at one time. Plaintiff explained to Ms. Henry the hearing loss that causes vertigo and imbalance, and the infections that can cause severe headaches. She assured Ms. Henry the headaches were manageable with medication.

26. Ms. Henry told Plaintiff that the accommodations would not be a problem, and that Plaintiff could ask the college aide working in the department, or any of her other coworkers, for help with high files or heavy boxes.

27. From July 7, 2008, to mid-August 2008 this accommodation request was granted.

C. **Harassment and Discrimination**

28. Toward the end of August 2008 Ms. Henry began ordering Plaintiff to climb ladders to search for files. The harassment and discrimination continued and escalated for the next several months, piling on ridicule and derision, until Plaintiff finally broke down on March 27, 2009.

29. When Ms. Henry saw that Plaintiff was sick, she would increase the intensity and cruelty of her attacks on Plaintiff. When Plaintiff told Ms. Henry she could not climb the ladder to retrieve the files and was scared, Ms. Henry would respond, "you are full of shit."

30. In addition Ms. Henry taunted Plaintiff about the way she walked, saying she is so tired of watching Plaintiff "bounce around" the office.

31. Ms. Henry said more than once that Plaintiff was only "half-assed" listening.

32. Plaintiff requested another meeting about the accommodations. That request was never fulfilled.

33. Ms. Henry told Plaintiff she was not allowed to talk to anyone outside of the department.

34. Ms. Henry ordered Plaintiff to climb ladders and search for "missing files." When Plaintiff objected, Ms. Henry said Plaintiff was talking back and would be fired for insubordination.

35. The office had a college aide with the title of file clerk. Normally it is the job of the file clerk to search for missing or mis-filed case files. Even though a person was employed by the office specifically to search for missing files, Ms.

Henry ordered Plaintiff to search for missing files, which required her to climb ladders to search the top rows.

36. The harassment went beyond ridicule of the Plaintiff's disabilities. Ms. Henry also singled out Plaintiff for her religion at the time, Mormon. Although it was common practice among the employees in the office to have small symbols of their devotion on their desks—a bible, a statuette of the Virgin Mary, a rosary—Ms. Henry insisted that Plaintiff remove any indication of her religion from her cubicle, such as her bible. Ms. Henry went so far as to equate Mormonism with the People's Temple and the Jonestown massacre of 1978, the second most horrific loss of American civilian life in history—second only to September 11.

37. The harassment was ongoing and pervasive, to the point Ms. Henry even ordered that Plaintiff not attend a birthday party attended by the entire rest of the office.

**D. Plaintiff Repeatedly Told Human Resources and Upper Management about the Harassment She Was Suffering at the Hands of Ashie Henry, to No Avail**

38. Plaintiff sent e-mails to Thomas Lintern, senior management at OCME and Ashie Henry's superior, every time the harassment occurred. Thomas Lintern was the Deputy Commissioner of Finance and Administration.

39. After e-mailing Mr. Lintern several times about the refusal of accommodations and Ms. Henry's harassment, finally on December 1, 2008, Plaintiff had a meeting with Ms. Henry and Tamoya Hooke from Human Resources. The meeting was supposed to be about Plaintiff's disability

accommodations and the harassment, but Ms. Henry turned it into a disciplinary meeting with HR. Plaintiff told Ms. Hooke about the accommodations, and Ms. Hooke responded that she needed a note.

40. Once again, after that meeting, Plaintiff provided the OCME with doctors' notes verifying her disabilities and needed accommodations, this time to Ms. Hooke in Human Resources.

41. Still, even after the formal meeting with Ms. Henry and Ms. Hooke from Human Resources, and after providing HR once again with doctors' notes of her need for accommodation, Plaintiff was still harassed and made to climb ladders.

42. During the December 1 meeting, Plaintiff also requested that her tasks and standards description be updated to reflect the additional work and responsibility Plaintiff had taken on since starting the job, in particular managing the Microsoft Excel spreadsheets and cross-training workers. and redesigning them to make them safer and less prone to error, and cross-training coworkers.

43. Finally around March 25, 2009 Plaintiff wrote a detailed e-mail to Mimi Mairs, an attorney working in the Office. Ms. Mairs sent the e-mail to Joey Lipton, who told her she must speak to Ellen Borakove, the OCME Grievances Officer.

44. Plaintiff spoke to Ms. Borakove about the problems. Within the next two days Ms. Henry's abuse and harassment became so overwhelming Plaintiff broke down and requested a special leave of absence.

45. Over the next several weeks Ms. Borakove made several lengthy phone calls to Plaintiff to enquire how she was recovering. During these calls Plaintiff told Ms. Borakove everything that Ms. Henry had subjected her to, in great detail.

**E. <u>Plaintiff Is Ordered to Falsify and Destroy Medical Examiner Documents</u>**

46. The Records Department of the Office of the Chief Medical Examiner, where Plaintiff worked, is responsible for maintaining and certifying the records of the Medical Examiner. These documents are requested or subpoenaed by the District Attorney for use in convicting criminal defendants.

47. Part of the Plaintiff's job in the Records Department was to fulfill these document requests, review the case files for completeness and authenticity, certify the documents under oath, and send them to the requesting District Attorney.

48. Ms. Henry, as the harassment escalated, insisted on several occasions that Plaintiff sign off on homicide files that the Plaintiff had never seen. When Plaintiff asked for an explanation, or to see the files themselves before certifying, Ms. Henry replied, "Do as you're told. Don't ask so many damn questions."

49. During the December 1, 2008, meeting with Tamoya Hooke, Plaintiff informed Tamoya Hooke that Ms. Henry was ordering her to certify case files without reviewing them.

50. In March 2009 Ms. Henry ordered Plaintiff to throw away Requests for Evidence that had inadvertently been sent to the Records Department. Concerned about the propriety of throwing away Requests for Evidence, Plaintiff, with the help of a coworker, forwarded the Requests to the Evidence Department.

**F. Plaintiff Requests Special Medical Leave of Absence and Is Fired in Violation of her Rights under the ADA**

51. After several months of continual and escalating abuse, Plaintiff finally broke down. On March 27, 2009, she requested a Special Medical Leave of Absence.

52. As a provisional employee she is not entitled to a regular medical leave of absence. The OCME, however, granted her special leave of absence because of her disabilities—severe daily migraine headaches, hearing loss in left ear, chronic left-ear infections, depression, and stress.

53. The leave of absence was granted effective April 2009 for up to six months if needed.

54. Plaintiff was scheduled to come back to work on August 13. Despite already being approved for up to six months if needed, as required for compliance with the ADA, on August 3 when she requested one more brief extension to August 25 to allow her new migraine medication time to take effect, this request was denied—a full five weeks before the six-month deadline.

**G. Retaliation**

55. When Plaintiff complained to others, including Tamoya Hooke in Human Resources during the December 1, 2009, meeting, about being forced to climb ladders in violation of her disability accommodations, Ms. Henry retaliated by making material changes to her work duties, telling her that she had to do whatever the college aides and machine aides told her to do. Plaintiff was a clerical assistant level 3, the highest level for that title, putting her above or at

most parallel to the college aides and machine aides, effectively reducing her position to humiliate and harass Plaintiff.

56. In retaliation for reporting the harassment Ms. Henry also refused to update the description of Plaintiff's tasks and standards to reflect the additional work and responsibility Plaintiff had taken on since starting the job, in particular managing the Microsoft Excel spreadsheets and cross-training workers. The tasks and standards description is essential for determining an employee's wages.

57. Plaintiff was cut off from health insurance on April 12th, 2009. Because the Leave of Absence related to her ADA qualifying disabilities, Plaintiff's health insurance should have continued.

58. Along with the request for an extension of medical leave of absence until August 25th, 2009, Plaintiff had also requested to meet with Jan English to discuss the grievances she had filed, and to discuss her concern for her coworkers because Plaintiff was fearful that the abuse would begin again.

59. In retaliation for not dropping the complaints regarding Ms. Henry, Plaintiff was promptly terminated.

60. In further retaliation, Ms. Henry misrepresented and exaggerated Plaintiff's use of accrued personal time and previously approved time off with medical notes in order to give her a written warning. The inaccurate description of Plaintiff's performance had a materially adverse impact on Plaintiff's employment.

61. During her six-month special leave of absence, on July 25, 2009, Plaintiff informed OCME that her new medication was working and that she should be

able to return to work soon. Plaintiff informed them that when she returned she would like to meet with Jan English and Ms. Borakove to follow up with her grievances.

62. In a matter of days OCME changed its policy toward Plaintiff and informed her from now on she would need the original doctors' notes, faxes were no longer acceptable. (Even as this arbitrary policy change was in direct response to Plaintiff's insistence that her grievances be followed through, in fact during her entire leave of absence, Plaintiff *did* send the original medical notes to both Jan English and Ashie Henry.)

63. The OCME required as well that Plaintiff send them the original medical note by the next business day, requiring Plaintiff to hire a Messenger to get the document to them on time.

64. They refused a brief two-week extension of her leave of absence, well before the six-months originally approved, and in stark contrast to monthly extensions she had received until that point. And shortly after that, they fired her, all within days of hearing that Plaintiff wished to follow up with her discrimination complaint against the office and Ms. Henry.

**H. False Claims on EEOC Response and**
**<u>Regarding Plaintiff's Work Performance</u>**

65. Defendants' response to the Plaintiff's EEOC complaint was fraught with misrepresentations and outright lies.

66. An employer has a duty to be truthful to the EEOC.

67. Defendants' misrepresentations had caused direct harm to Plaintiff by influencing the EEOC not to find in Plaintiff's favor.

68. Defendant told the EEOC that Plaintiff was incompetent.

69. Defendant further told falsehoods during meetings at work.

70. Defendant stated Plaintiff took off 11 days in November. In fact she was absent for only a few hours, and always for pre-approved doctor's appointments.

**FIRST CAUSE OF ACTION**
**(Discrimination based on disability under the Americans with Disabilities Act (42 U.S.C. § 12101 et. seq.))**

71. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 70 as though fully set forth herein.

72. Plaintiff is and was at all times relevant hereto a qualified person with a disability as defined in 42 U.S.C. §§ 12102 & 12111.

73. Plaintiff's repeated requests to be allowed to use paper time sheets, not to climb ladders, and for periodic doctor's appointments for ear infections, as well as her special medical leave of absence in April 2009, all as described above, were requests for reasonable accommodation under 42 U.S.C. § 12111.

74. By repeatedly insisting Plaintiff climb ladders, under threat of termination, Defendant discriminated against the Plaintiff in the terms and conditions of her employment, in violation of 42 U.S.C. § 12111 et seq.

75. By subsequently discharging Plaintiff from employment on or about August 13, 2009, Defendant discriminated against Plaintiff in the terms and conditions of her employment, in violation of 42 U.S.C. § 12111 et seq.

76. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

**SECOND CAUSE OF ACTION**
**(Discrimination based on disability in violation of New York State Human Rights Law (N.Y. Exec. Law § 292 et seq.))**

77. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 76 as though fully set forth herein.

78. Plaintiff is and was at all times relevant hereto a person with a disability as defined in N.Y. Exec. Law § 292(21).

79. Plaintiff's repeated requests to be allowed to use paper time sheets, not to climb ladders, and for periodic doctor's appointments for ear infections, as well as her special medical leave of absence in April 2009, all as described above, were requests for reasonable accommodation under N.Y. Exec. Law § 292(21-e).

80. By repeatedly insisting Plaintiff climb ladders, under threat of termination, Defendant discriminated against the Plaintiff in the terms and conditions of her employment, in violation of N.Y. Exec. Law §§ 296(1)(a) & (3)(a).

81. By subsequently discharging Plaintiff from employment on or about August 13, 2009, Defendant discriminated against Plaintiff in the terms and conditions of her employment, in violation of N.Y. Exec. Law §§ 296(1)(a) & (3)(a).

82. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

## THIRD CAUSE OF ACTION
**(Discrimination based on disability in violation of New York City Human Rights Law (N.Y. City Admin. Code Title 8))**

83. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 82 as though fully set forth herein.

84. Plaintiff is and was at all times relevant hereto a person with a disability under Title 8, Chapter 1, § 8-102(16) of the N.Y.C. Admin. Code.

85. Plaintiff's repeated requests to be allowed to use paper time sheets, not to climb ladders, and for periodic doctor's appointments for ear infections, as well as her special medical leave of absence in April 2009, all as described above, were requests for reasonable accommodation under N.Y.C. Admin. Code § 8-102(18).

86. By repeatedly insisting Plaintiff climb ladders, under threat of termination, Defendant discriminated against the Plaintiff in the terms and conditions of her employment, in violation of N.Y.C. Admin. Code §§ 8-107(1)(a) & (15).

87. By subsequently discharging Plaintiff from employment on or about August 13, 2009, Defendant discriminated against Plaintiff in the terms and conditions of her employment, in violation of N.Y.C. Admin. Code §§ 8-107(1)(a) & (15).

88. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

**FOURTH CAUSE OF ACTION**
**(Retaliation for opposing disability discrimination, in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.))**

89. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 88 as though fully set forth herein.

90. Plaintiff is and was at all times relevant hereto a person with a disability as defined in 42 U.S.C. §§ 12102 & 12111.

91. Plaintiff's repeated requests to be allowed to use paper time sheets, not to climb ladders, and for periodic doctor's appointments for ear infections, as well as her special medical leave of absence in April 2009, all as described above, were requests for reasonable accommodation under 42 U.S.C. § 12111.

92. By repeatedly insisting Plaintiff climb ladders, under threat of termination, Defendant discriminated against the Plaintiff in the terms and conditions of her employment, in violation of 42 U.S.C. § 12111 et seq.

93. Beginning in or around September 2008 Plaintiff wrote e-mails to Mr. Lintern, the superior of Ms. Henry, Plaintiff's immediate supervisor, concerning Ms. Henry's continued insistence Plaintiff climb ladders.

94. In December 2008 at the meeting with Tamoya Hooke from Human Resources, Ms. Henry became aware of Plaintiff's complaints about the disability

discrimination she was being subjected to. In retaliation Ms. Henry's harassment of Plaintiff for her disability increased, in violation of 42 U.S.C. § 12111.

95. In August 2009 when the Defendant discovered Plaintiff intended to pursue her complaint against Ms. Henry's discrimination and harassment, the Defendant immediately fired Plaintiff in retaliation, in violation of 42 U.S.C. § 12111 et seq.

96. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

**<u>FIFTH CAUSE OF ACTION</u>**
**(Retaliation for opposing disability discrimination, in violation of New York State Human Rights Law (N.Y. Exec. Law § 292 et. seq.))**

97. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 96 as though fully set forth herein.

98. Plaintiff is and was at all times relevant hereto a person with a disability as defined in N.Y. Exec. Law § 292(21).

99. Plaintiff's repeated requests to be allowed to use paper time sheets, not to climb ladders, and for periodic doctor's appointments for ear infections, as well as her special medical leave of absence in April 2009, all as described above, were requests for reasonable accommodation under N.Y. Exec. Law § 292(21-e).

100. By repeatedly insisting Plaintiff climb ladders, under threat of termination, Defendant discriminated against the Plaintiff in the terms and

conditions of her employment, in violation of N.Y. Exec. Law §§ 296(1)(a) & (3)(a).

101. Beginning in or around September 2008 Plaintiff wrote e-mails to Mr. Lintern, the superior of Ms. Henry, Plaintiff's immediate supervisor, concerning Ms. Henry's continued insistence Plaintiff climb ladders.

102. In December 2008 at the meeting with Tamoya Hooke from Human Resources, Ms. Henry became aware of Plaintiff's complaints about the disability discrimination she was being subjected to. In retaliation Ms. Henry's harassment of Plaintiff for her disability increased, in violation of N.Y. Exec. Law § 292 et seq.

103. In August 2009 when the Defendant discovered Plaintiff intended to pursue her complaint against Ms. Henry's discrimination and harassment, the Defendant immediately fired Plaintiff in retaliation, in violation of N.Y. Exec. Law prohibiting retaliation.

104. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

**<u>SIXTH CAUSE OF ACTION</u>**
**(Retaliation for opposing disability discrimination, in violation of New York City Human Rights Law (N.Y.C. Admin. Code Title 8))**

105. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 104 as though fully set forth herein.

106. Plaintiff is and was at all times relevant hereto a person with a disability under Title 8, Chapter 1, § 8-102(16) of the N.Y.C. Admin. Code.

107. Plaintiff's repeated requests to be allowed to use paper time sheets, not to climb ladders, and for periodic doctor's appointments for ear infections, as well as her special medical leave of absence in April 2009, all as described above, were requests for reasonable accommodation under N.Y.C. Admin. Code § 8-102(18).

108. By repeatedly insisting Plaintiff climb ladders, under threat of termination, Defendant discriminated against the Plaintiff in the terms and conditions of her employment, in violation of N.Y.C. Admin. Code §§ 8-107(1)(a) & (15).

109. Beginning in or around September 2008 Plaintiff wrote e-mails to Mr. Lintern, the superior of Ms. Henry, Plaintiff's immediate supervisor, concerning Ms. Henry's continued insistence Plaintiff climb ladders.

110. In December 2008 at the meeting with Tamoya Hooke from Human Resources, Ms. Henry became aware of Plaintiff's complaints about the disability discrimination she was being subjected to. In retaliation Ms. Henry's harassment of Plaintiff for her disability increased, in violation of N.Y.C. Admin. Code § 8-107(7) prohibiting retaliation.

111. In August 2009 when the Defendant discovered Plaintiff intended to pursue her complaint against Ms. Henry's discrimination and harassment, the Defendant immediately fired Plaintiff in retaliation, in violation of N.Y.C. Admin. Code § 8-107(7) prohibiting retaliation.

112. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

## SEVENTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**

113. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 112 as though fully set forth herein.

114. Plaintiff has disabilities in the form of a permanently injured hand, and inner ear problems that have resulted in deafness in her left ear, that cause problems with her balance, and that cause her frequent ear infections and migraines.

115. All of these disabilities have visual manifestations that cause the Plaintiff self-consciousness and embarrassment—a hearing aid, an unusual bobbing motion when she walks, frequently cotton in her ear to treat the infection.

116. In addition these disabilities required certain minor accommodations, in particular the Plaintiff's ear problem gives her positional vertigo that makes it dangerous for her to climb ladders.

117. Ms. Henry, Plaintiff's immediate supervisor, was aware of these disabilities and their necessary accommodations virtually from the beginning of Plaintiff's employment with the OCME.

118. In September 2008 Ms. Henry began ridiculing Plaintiff for her disabilities, making such comments as that Plaintiff is a "half-assed" listener

because of the cotton in her ear, and that Ms. Henry is tired of Plaintiff "bouncing around" the office.

119. Worse still, Ms. Henry forced Plaintiff to climb ladders under threat of termination, putting Plaintiff in actual fear of falling and injury.

120. Adding to the harassment, Ms. Henry forced Plaintiff to sign documents she had not reviewed, again under threat of termination.

121. And Ms. Henry ridiculed Plaintiff's religion, calling it a cult and equating it with the 1978 Jonestown massacre, and forcing Plaintiff to remove any indication of her beliefs from her cubicle. Plaintiff was the only employee in the office not allowed to display small tokens of personal religious belief.

122. Senior management was aware of this abuse for many months while Ms. Henry's campaign of harassment and terror continued unabated.

123. This extreme and outrageous, even horrific, conduct continued and intensified until the Plaintiff finally collapsed in March of 2009 and took a special medical leave of absence.

124. Each element of this harassment, individually and cumulatively, directly and immediately caused Plaintiff damage in the form of severe emotional distress, causing her immediate fear of bodily injury, embarrassment, pain and mental anguish, depression, weight gain, and loss of self-esteem.

125. Punitive damages are necessary to deter Defendants from engaging in this outrageous behavior toward any current and future employees, especially those with disabilities.

**EIGHTH CAUSE OF ACTION**
**(Injurious Falsehood in performance review)**

126. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 125 as though fully set forth herein.

127. Ms. Henry, the Human Resources Department, and other employees of the OCME made and allowed to be made false accusations of misconduct on the part of the Plaintiff in their performance reviews of her.

128. In addition Ms. Henry, the Human Resources Department, and the other employees of the OCME omitted and allowed to be omitted truthful statements about the true nature of Plaintiff's employment and her consistent desire to do more than was asked of her.

129. Upon information and belief these falsehoods were calculated to damage Plaintiff's reputation and her future at the OCME.

130. These falsehoods caused Plaintiff special damages in the form of lost opportunity and employment. Plaintiff will have difficult time finding new employment with the City, and any other employer that inquires about her job performance at the OCME.

**NINTH CAUSE OF ACTION**
**(Injurious Falsehood to EEOC)**

131. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 130 as though fully set forth herein.

132. Ms. Henry, the Human Resources Department, and other employees of the OCME made and allowed to be made false accusations of misconduct on the

part of the Plaintiff in their investigations and statements to the EEOC in response to Plaintiff's complaint.

133. In addition Ms. Henry, the Human Resources Department, and the other employees of the OCME omitted and allowed to be omitted truthful statements about the true nature of Plaintiff's employment and her consistent desire to do more than was asked of her.

134. The Defendants' response to the EEOC was fraught with blatant misrepresentations of the truth, including the outrageous claim that the OCME was not aware of Plaintiff's disability until after she went on leave of absence in March 2009.

135. Upon information and belief these falsehoods were calculated to damage Plaintiff by negatively influencing the EEOC's response to Plaintiff's complaint.

136. These falsehoods caused Plaintiff special damages in the form of diminished opportunity to have the EEOC pursue her claim. Plaintiff will have a more difficult time pursuing these claims of discrimination and retaliation than if the EEOC had sanctioned the claims by taking the case itself.

## TENTH CAUSE OF ACTION
**(Breach of Duty of Good Faith and Fair Dealing)**

137. Plaintiff repeats and reasserts the allegations of paragraphs 1 through 136 as though fully set forth herein.

138. As Plaintiff's supervisor, Ms. Henry had a contractual employment relationship with Plaintiff.

139. Part of any contract is a duty of good faith and fair dealing.

140. By filing false claims concerning Plaintiff's work, refusing to acknowledge the work Plaintiff was doing that was above her job description, refusing to accommodate her disabilities, repeatedly threatening to fire her, insulting her, forcing her to do possibly illegal actions by signing files she had not reviewed, refusing to give her credit for suggestions she made that increased the efficiency of the office dramatically, and contributing to the false response to Plaintiff's EEOC filing, Ms. Henry violated her duty of good faith and fair dealing toward the Plaintiff in their work relationship.

141. By knowingly, or recklessly failing to know, that this conduct was occurring, and by filing a fallacious response to the EEOC, the Defendant City too breached its duty of good faith and fair dealing toward the Plaintiff.

142. Plaintiff has been damaged by Defendants' unlawful acts, by the loss of her salary and benefits of employment, and she has suffered emotional distress, all in an amount to be determined at the trial of this proceeding.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for relief against the City of New York as follows:

(a) compensatory damages in an amount to be determined at trial;

(b) special damages in an amount to be determined at trial;

(c) punitive damages in an amount to be determined at trial, for the wanton, malicious, and intentional nature of the Defendants' conduct, to deter them from further such conduct;

(d) an order from this court for Defendants' to reinstate Plaintiff's employment, with all back pay;

(e) any other further such relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: September 15, 2011
New York, New York

Respectfully submitted by:

Liza Hernandez

Liza Hernandez, pro se
32-63 45th Street
Queens, NY 11103
(917) 439-2010, *phone*
lizajenny9@gmail.com, *e-mail*

* I recieved the "Right to Sue Letter" on June 20th, 2011.