UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

LIZA HERNANDEZ,

                Plaintiff,

          v.

CITY OF NEW YORK,

                Defendant.

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 23, 2015

11 Civ. 6644 (KPF) (DF)

**OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION**

KATHERINE POLK FAILLA, District Judge:

      On November 25, 2014, United States Magistrate Judge Debra Freeman issued a Report and Recommendation (the "Report") recommending that this Court grant Defendant City of New York's ("Defendant" or the "City") motion for summary judgment with respect to all of Plaintiff Liza Hernandez's federal claims, and decline to exercise supplemental jurisdiction over Plaintiff's pendent state and city law claims.  (Dkt. #94).  Plaintiff has filed objections to the Report.  (Dkt. #99).  For the reasons set forth below, the Court finds no error in the Report and adopts the Report in its entirety.

## BACKGROUND

      The Court presumes the parties' familiarity with the factual allegations of this action, as well as its extensive procedural history, both of which are thoroughly set forth in the Report.  (*See* Report 2-8 (factual background), 8-14

(procedural history)).[1]  In broad summary, Plaintiff claims that (i) she was subjected to discrimination (both disparate treatment and a hostile work environment) by her employer, the City's Office of Chief Medical Examiner ("OCME"), on the basis of her medical conditions; (ii) OCME discriminated against her, and subjected her to improper retaliation, by failing to make reasonable accommodations, and by revoking previously-made reasonable accommodations, that would allow Plaintiff to perform the duties of her position at OCME; and (iii) she ultimately lost her job at OCME because of discrimination against her based on her medical conditions and in retaliation for her complaints about previous discriminatory treatment.  (*See* Dkt. #33 at ¶¶ 23-85).

On September 16, 2011, Plaintiff filed a complaint against the City of New York and her former supervisor (Dkt. #2); the Second Amended Complaint, the operative complaint in this case, was filed on July 13, 2012 (Dkt. #33). Plaintiff asserted claims under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (the "NYSHRL"); and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 (the "NYCHRL"); she also included a claim for intentional infliction of emotional distress under New York State law.  (*Id.* at ¶¶ 86-100).[2]

---

[1]     Plaintiff's challenges to certain of Judge Freeman's factual findings are addressed at pages 6 through 10 of this Opinion.

[2]     Plaintiff also raised a claim of discrimination based on her religion under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII") (Dkt. #33 at ¶ 101), but Judge Freeman disallowed that particular proposed amendment after

On March 24, 2014, the City moved for summary judgment with respect to all of Plaintiff's claims. (Dkt. #78-83). Plaintiff filed an affirmation in opposition on July 1, 2014 (Dkt. #89), and the City filed its reply brief on July 25, 2014 (Dkt. #92).

Judge Freeman issued her Report on November 25, 2014. In the course of 42 pages, Judge Freeman recommended that the Court find that: (i) Plaintiff's claim that Defendant had improperly revoked a previous reasonable accommodation for her positional vertigo was time-barred (Report 25-27); (ii) her claim that Defendant had failed to provide a reasonable accommodation in the form of extending her medical leave failed because Plaintiff presented no evidence that a requested, finite leave of absence would have enabled her to return to work (*id.* at 27-30); (iii) Plaintiff's claim of discriminatory termination of employment failed for similar reasons (*id.* at 33); (iv) her claim of a hostile work environment was time-barred (*id.* at 30-33); and (v) Plaintiff's claim of retaliatory discharge failed because of the absence of evidence of a causal connection between her complaints and her termination (*id.* at 34-38). Judge Freeman further recommended that the Court decline to exercise supplemental jurisdiction over pendent state and city law claims, noting that the traditional factors of judicial economy, convenience, fairness, and comity pointed toward declination, particularly given the differing legal frameworks involved. (*Id.* at 38-40).

---

finding that the religious discrimination claim was not included among, and was not "reasonably related" to, the charge (the "EEOC Charge") Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC"). (Dkt. #44).

Citing 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), Judge Freeman advised the parties that they had 14 days from the issuance of the Report to file written objections.  (Report 41).  Defendant filed no objections.  By letter dated December 12, 2014, Plaintiff sought a six-month extension of the time to file objections (Dkt. #95); the Court granted that request in part, allowing a 30-day extension, *nunc pro tunc*, until January 9, 2015, to file objections (Dkt. #96).  Plaintiff filed her objections on January 9, 2015.  (Dkt. #99 ("Objections")).

## THE STANDARD OF REVIEW

When a district court assesses the report and recommendation of a magistrate judge, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  If a party properly objects to a finding in the Report, the Court reviews the finding de novo.  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").[3]

Properly raised objections must be "'clearly aimed at particular findings'" in the Report.  *Vlad-Berindan* v. *MTA N.Y.C. Transit*, No. 14 Civ. 675 (RJS), 2014 WL 6982929, at *1 (S.D.N.Y. Dec. 10, 2014) (quoting *Harden* v. *LaClaire*,

---

[3]     In contrast, a party's failure to object to a report and recommendation, after receiving clear notice of the consequences of such a failure, operates as a waiver of the party's right both to object to the report and recommendation and to obtain appellate review.  *See Frank* v. *Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *see also Caidor* v. *Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (concluding that a pro se plaintiff waives the right to appellate review by not timely objecting to a report and recommendation, provided the Magistrate Judge warned plaintiff and cited the appropriate provisions of the Federal Rules of Civil Procedure and Title 28 of the United States Code).

No. 07 Civ. 4592 (LTS), 2008 WL 4735231, at *1 (S.D.N.Y. Oct. 27, 2008)). In consequence, objections may not be "conclusory or general," and parties may not simply regurgitate the original briefs to the magistrate judge. *Thomas* v. *Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009) (internal quotation marks and citation omitted); *see generally Mario* v. *P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (finding party who filed cursory objections to magistrate judge's report and recommendation failed adequately to object under Fed. R. Civ. P. 72(b)). Conversely, objections generally may not include new arguments "that were not raised, and thus were not considered, by the magistrate judge." *Jackson* v. *Brandt*, No. 10 Civ. 5858 (PAC), 2012 WL 2512015, at *6 (S.D.N.Y. June 29, 2012) (order adopting report and recommendation); *see also Berbick* v. *Precinct 42*, 977 F. Supp. 2d 268, 273 (S.D.N.Y. 2013) ("A motion referred to a magistrate judge is not a trial run." (alterations and internal quotation marks omitted)).

Absent proper objections, a district court should accept all parts of a report and recommendation that are not clearly erroneous. *See Berbick*, 977 F. Supp. 2d at 273; *see also King* v. *Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) ("To accept those portions of the report to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." (internal quotation marks and citation omitted)), *aff'd*, 453 F. App'x 88 (2d Cir. 2011) (summary order). In this regard, "the Court reviews a party's *improper* objections, including those that seek a 'second bite at the apple' by 'attempt[ing] to

relitigate the entire content' of the arguments made before the magistrate judge, only for clear error." *Vlad-Berindan*, 2014 WL 6982929, at *2 (quoting *Thomas*, 674 F. Supp. 2d at 511) (emphasis in *Vlad-Berindan*).  In clear error review, a court should reverse a finding only if it is "left with the definite and firm conviction that a mistake has been committed," and not merely if it "would have decided the case differently." *Easley* v. *Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks omitted).

"Objections of *pro se* litigants are generally accorded leniency and construed to raise the strongest arguments that they suggest." *Quinn* v. *Stewart*, No. 10 Civ. 8692 (PAE)(JCF), 2012 WL 1080145, at *4 (S.D.N.Y. Apr. 2, 2012) (internal quotation marks omitted).  "Nonetheless, even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a 'second bite at the apple' by simply relitigating a prior argument." *Pinkney* v. *Progressive Home Health Servs.*, No. 06 Civ. 5023 (LTS), 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008).

## DISCUSSION[4]

Plaintiff first objects to a number of Judge Freeman's factual findings. As to these objections, the Court makes the following preliminary comments: First, certain of the facts to which Plaintiff now objects were accepted by Judge Freeman precisely because Plaintiff neither contested a statement listed in

---

[4]     Citations to Plaintiff's Objections are made using the page-numbering convention assigned by the Court's electronic case filing ("ECF") system.

Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1, nor offered a contradictory factual assertion in her opposition papers or in her deposition testimony.  (*See* Report 2 n.1 (noting that because of Plaintiff's failure to comply with Local Rule 56.1, "the facts summarized in this section are taken from Defendant's Rule 56.1 statement, Plaintiff's opposition affirmation (which was declared to be made under penalty of perjury), and certain evidence in the record, including Plaintiff's deposition testimony")).  Second, and perhaps more importantly, Plaintiff misperceives the significance of many of the findings to which she now objects.  In particular, Plaintiff overlooks both the solicitude with which Judge Freeman viewed the record[5] and the fact that many of her claims were resolved on procedural bases that existed independently of the facts Plaintiff now challenges.

Addressing Plaintiff's factual objections in turn, the Court notes as follows:

- Plaintiff begins by challenging Judge Freeman's statement in the first paragraph of the Report that "Plaintiff's claim[s] largely arise from the termination of her employment, which occurred after she requested an extension of an approved medical leave." (Objections 1 (citing Report 1)).  Put simply, Judge Freeman's focus in this sentence was self-evidently temporal, and not causal, and this statement is an accurate representation of the sequence of events.  With particular respect to Plaintiff's challenges that the statement (i) fails to discern the true cause of her termination, (ii) neglects to mention Plaintiff's provision of original documentation to OCME, and (iii) is but one of many grievances Plaintiff lists in her complaint (*see*

---

[5]   The Court notes, for example, the many occasions on which Judge Freeman assumed facts and resolved open evidentiary issues in a manner favorable to Plaintiff.  (*See, e.g.*, Report 2 n.1, 5 n.5, 7 n.6, 26 n.12, 30 n.16, 34-35).

*id.*), Judge Freeman addresses each of these challenges, as well as other arguments raised by Plaintiff, in the remaining 41 pages of the Report.

▪   Plaintiff then levies a series of challenges to statements in the "Factual Background" portion of the Report, none of which succeeds. (Objections 2-3). Plaintiff notes, for instance, that the August 11, 2009 letter from Dr. Emannuel Decade that was submitted in support of her last request for an extension of leave referenced the need for "further counseling services." (Dkt. #80 at Ex. PP). From this, she argues that Judge Freeman misstated the doctor's letter in her Report. (Objections 2). A careful review of the Report, however, discloses that Judge Freeman understood, and properly quoted, the contents of the letter. (*See* Report 8, 29-30). More broadly, Judge Freeman accepted the contents of each of the letters from Plaintiff's medical and treating professionals, but found — correctly — that none of them provided the requisite certainty as to when, if ever, Plaintiff could return to work.

▪   Plaintiff also quibbles with Judge Freeman's inclusion of the task of retrieving files within Plaintiff's job duties. (Objections 2). This inclusion almost certainly occurred, however, because Plaintiff failed to object to Defendant's Statement of Undisputed Facts. Moreover, inasmuch as Plaintiff had consistently argued that OCME initially accommodated her positional vertigo by allowing her to obtain assistance if a task required climbing ladders or lifting heavy objects, but then revoked that accommodation, it was reasonable for Judge Freeman to conclude that Plaintiff's job duties might involve climbing ladders to retrieve files. In any event, Plaintiff's claims of failure to provide a reasonable accommodation were found to be time-barred.

▪   Plaintiff takes issue with Judge Freeman's statement that "[i]n or about February 2009, after Plaintiff made an email complaint against [her supervisor, Ashie] Henry, Defendant assigned Plaintiff a new supervisor, Cynthia Paulin[.]'" (Objections 2 (citing Report 5)). Plaintiff notes that she began complaining about Henry in August 2008. (*Id.*). As it happens, this objection is contradicted by Plaintiff's own testimony and submissions, which indicate that her relationship with

8

Henry began to deteriorate in September 2008. (*See, e.g.*, Dkt. #33 at ¶¶ 6, 29 (Second Amended Complaint)). Again, however, Plaintiff is missing the forest for the trees; Judge Freeman was not purporting to identify the first of Plaintiff's many complaints to OCME officials, but rather to approximate the date on which her supervisor changed.

▪ Plaintiff infers from the Report a finding that no formal complaint was made, to which she takes offense, and in response to which she notes that "[i]t is not required that an employee, current or former, *meet in person* to make a complaint[.]" (Report 3 (emphasis in original)). The latter statement may be true, but it is also irrelevant; Judge Freeman noted in great detail, at pages 36 through 37 of her Report, the many occasions on which Plaintiff had complained, formally or informally.

Plaintiff objects wholesale to Judge Freeman's description of the discovery disputes that preceded the instant motion (Objections 4), and offers instead an affidavit in which she complains about Judge Freeman's failure to impose sanctions on Defendant for ostensible discovery abuses (*id.* at 19-25). To the extent Plaintiff is seeking to present an alternate history of the conduct of discovery in this case, the Court rejects this version in favor of the procedural history outlined by Judge Freeman, which more accurately tracks the docket in this case.  To the extent that Plaintiff seeks to appeal from the discovery rulings she outlines in her affirmation, the Court rejects her application as untimely, since the issues arose between November 2013 and January 2014.  *See* Fed. R. Civ. P. 72(a) ("When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision.

9

A party may serve and file objections to the order within 14 days after being served with a copy.  A party may not assign as error a defect in the order not timely objected to.").[6]

Plaintiff's objections to Judge Freeman's legal conclusions are far less detailed.  At page 4 of her Objections, Plaintiff contends that "[t]here are genuine issues of material fact[] that exist[]," and at page 5 she contends that "[s]ummary [j]udgment should be denied and all claims that I have made are 100% truthful."  (Objections 4-5).  These are not proper objections.  That said, the Court has reviewed Judge Freeman's comprehensive Report, and finds it to be well reasoned and grounded in fact and law.   Plaintiff can advance no valid factual or legal challenge to Judge Freeman's conclusion that Plaintiff's claims for failure to make a reasonable accommodation for her positional vertigo and for hostile work environment were time-barred.  Plaintiff similarly cannot dispute the fact that, while there may have been much correspondence between and among Plaintiff and her treating professionals and OCME, none of that evidence (in particular, none of the communications in July and August 2009) gave any indication as to when Plaintiff could resume her duties at OCME; as such, Defendant has correctly identified the absence of a genuine issue of material fact as to whether Plaintiff was a "qualified individual" under the ADA.  (Report 27-30).

---

[6]     It bears repeating that, as to many of the items that Plaintiff claims should have been produced in discovery, Judge Freeman assumed that the items existed in the form (and with the content) identified by Plaintiff.  *See* n.5 in this Opinion.

There are two areas for which Plaintiff provides more than a conclusory objection. However, neither provides a basis for departing from Judge Freeman's recommendation. First, Plaintiff objects to the Report's statement that she is procedurally barred from bringing a claim for religious discrimination, and counters that she had in fact exhausted her remedies with the EEOC. (Objections 3; *see* Report 9-10 (recounting prior motion practice)). The record does not bear out Plaintiff's claims of exhaustion. More importantly, however, Judge Freeman denied Plaintiff leave to amend in an Opinion and Order dated March 11, 2013 (Dkt. #44), where she specifically concluded that Plaintiff would not be permitted to amend her complaint to add a charge of discrimination based on her religion. Plaintiff's time to appeal from that decision has long since lapsed, and the Court will accordingly not consider her application here. *See* Fed. R. Civ. P. 72(a).[7]

Finally, Plaintiff claims that there is evidence of a causal connection between her requests to follow up on an earlier complaint of discrimination

---

[7]   In any event, Plaintiff's claims fail on the merits, regardless of whether the denial of her motion to amend is reviewed as a non-dispositive motion (which, generally speaking, is subject to a "clearly erroneous or contrary to law" standard) or a dispositive motion (as to which proper objections are subject to de novo review). *See generally Diaz* v. *Local 338 of the Retail, Wholesale Dept. Store Union, United Food and Commercial Workers*, No. 13 Civ. 7187 (SJF)(SIL), 2014 WL 5502316, at *1-2 (E.D.N.Y. Oct. 28, 2014). Having reviewed Plaintiff's EEOC Charge, the Court agrees fully with Judge Freeman's conclusions that Plaintiff's claim of religious discrimination was neither included in the Charge nor "reasonably related" to the facts that Plaintiff did include, and, consequently, that Plaintiff did not exhaust her administrative remedies with respect to the religious discrimination charge. *See Butts* v. *City of New York*, 990 F.2d 1397, 1401-02 (2d Cir. 1993). It would have been futile for Plaintiff to have brought such a claim, and Judge Freeman therefore did not err in denying that portion of Plaintiff's motion to amend. *See Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (upholding denial of leave to amend pro se complaint where proposed amendment would have been futile; "Repleading would thus be futile. Such a futile request to replead should be denied.").

upon her return to work and her ultimate termination.  (Objections 5).  This is, of course, a retread of arguments presented to Judge Freeman (*see* Report 36-37 (outlining Plaintiff's arguments)), and thus not a proper objection.  That said, after reviewing the record in its entirety, the Court agrees with Judge Freeman that no reasonable jury could infer a causal link between Plaintiff's complaints — either considered in their totality or considering the complaints filed closest to her termination — and Plaintiff's termination.  Plaintiff has not, and cannot, raise a genuine issue of material fact as to whether her complaints were a motivating factor in her termination.[8]  As Plaintiff readily admits, she filed numerous complaints throughout 2008 and 2009, and yet none resulted in an adverse employment action against Plaintiff.  (*See* Report 36-37 (listing complaints)).  Even after she went out on medical leave in March 2009, Plaintiff continued to advise OCME personnel of pending complaints and forthcoming complaints concerning Henry; with full knowledge of those complaints, Defendant not only did not terminate Plaintiff's employment, but repeatedly granted her requests for extensions of leave.  (*See* Dkt. #80, Ex. V-Z, AA-JJ).

---

[8]  In *University of Tex. Sw. Med. Ctr.* v. *Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court held that, for a Title VII retaliation claim (as distinguished from a discrimination claim), a plaintiff must establish that the allegedly unlawful retaliation "was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Id.* at 2526, 2533; *see also Zann Kwan* v. *Andalex Grp.*, 737 F.3d 834, 845 (2d Cir. 2013) (citing *Nassar*).  Neither the Supreme Court nor the Second Circuit has extended *Nassar*'s holding to retaliation claims brought under the ADA, though several district courts have presaged such an extension.  *See Sherman* v. *County of Suffolk*, No. 11 Civ. 2528 (ADS), — F. Supp. 3d —, 2014 WL 7370033, at *13-14 (E.D.N.Y. Dec. 29, 2014) (discussing cases); *see generally Wesley-Dickson* v. *Warwick Valley Cent. School Dist.*, 586 F. App'x 739, ___, No. 13-4164-cv, 2014 WL 4958166, at *6 n.3 (2d Cir. Oct. 6, 2014) (declining to decide the issue, in light of conclusion that plaintiff had not satisfied even the "more lenient 'motivating factor' standard").  Needless to say, Plaintiff's arguments would fall even further short of *Nassar*'s "but-for" standard than they do here under a "motivating factor" analysis.

The fact that OCME subsequently declined to extend Plaintiff's leave further, in the absence of any documentation that indicated a definite date on which Plaintiff could return to work, can in no way be traced to her complaints.

Plaintiff fares no better in limiting her causal connection argument to her communications with OCME personnel immediately prior to her termination, including her July 30, 2009 letter to Human Resources Director Jan English (Objections 26; Dkt. #80, Ex. WW), and her August 12, 2009 email to Deputy Commissioner of Finance and Administration Thomas Lintern (Dkt. #80, Ex. M).  While these communications may be closer in time to Plaintiff's termination, they are no different in kind from the complaints that she made about Henry from September 2008 through March 27, 2009, her last day in the office.  Particularly when these more recent complaints are considered alongside the extensive, contemporaneous communications concerning the termination date of Plaintiff's leave and the insufficiency of the documentation from Plaintiff and her treating professionals, the Court must agree with Judge Freeman that Plaintiff's complaints were not a "motivating factor" in her termination.

For all of these reasons, the Report is adopted in its entirety.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED as to Plaintiff's federal claims, and those claims are DISMISSED WITH PREJUDICE.  Because the Court declines to exercise supplemental jurisdiction over Plaintiff's pendent

state and city law claims, those claims are DISMISSED WITHOUT PREJUDICE
to permit Plaintiff's refiling of them in state court.

The Clerk of Court is directed to terminate all pending motions, adjourn
all remaining dates, and close this case.

SO ORDERED.

Dated:        January 23, 2015
              New York, New York

                                              _____
                                              KATHERINE POLK FAILLA
                                              United States District Judge

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LIZA HERNANDEZ,                                    :

                              Plaintiff,           :     Case No. 11cv6644 (KPF) (DF)

              -against-                            :     **REPORT AND**
                                                         **RECOMMENDATION**
CITY OF NEW YORK,                                  :

                              Defendant.           :
-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/25/14
```

**TO THE HONORABLE KATHERINE P. FAILLA, U.S.D.J.:**

In this employment discrimination action brought pursuant to the Americans with

Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the New York State Human Rights Law,

N.Y. Exec. Law §§ 292 *et seq.* ("NYSHRL"); the New York City Human Rights Law,

N.Y.C. Code §§ 8-107 *et seq.* ("NYCHRL"); and New York common law, *pro se* plaintiff

Liza Hernandez ("Plaintiff") seeks damages and equitable relief from her former employer, the

City of New York ("Defendant"), for unlawful discrimination against her on the basis of

disability, retaliation for opposing disability discrimination, and intentional infliction of

emotional distress.  Plaintiff's claims largely arise from the termination of her employment,

which occurred after she requested an extension of an approved medical leave.  (*See generally*

Second Amended Complaint, dated Mar. 25, 2013 ("Am. Compl.") (Dkt. 45).)

Currently before the Court is Defendant's motion for summary judgment (Dkt. 78),

which has been referred to me for a report and recommendation.  For the reasons that follow,

I recommend that Defendant's motion be granted with respect to all of Plaintiff's federal claims.

I further recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's

state and city law claims, and that they therefore be dismissed without prejudice to Plaintiff's

filing those claims in state court.

## BACKGROUND

A.     <u>Factual Background</u>[1]

1.     **Plaintiff's Medical Conditions and<br>Initial Employment with Defendant**

Plaintiff claims that she was subjected to discriminatory treatment on the basis of her

medical conditions while she was employed by Defendant, and that her employment was

eventually terminated because of those conditions and for opposing discriminatory treatment.

Plaintiff's medical conditions, which Defendant does not dispute, included a perforated eardrum

(leading to hearing loss, ear infections, and positional vertigo), depression and anxiety, anemia,

and migraine headaches.[2]  At or near the time of her termination, Plaintiff also reported that an

MRI had revealed that she had a posterior fossa arachnoid cyst (*see* Declaration of Kathryn E.

Martin, Esq., dated Mar. 24, 2014 ("Martin Decl.") (Dkt. 80), Ex. LL), which can apparently

---

[1] Plaintiff has submitted only an affirmation and other documents (*see* Affirmation of Plaintiff in Opposition to Motion for Summary Judgment, dated June 30, 2014 ("Pl. Aff.") (Dkt. 89)), rather than a paragraph-by-paragraph response to Defendant's Rule 56.1 Statement of Uncontested Facts (dated March 24, 2014 ("Def. 56.1 Stmt.") (Dkt. 82)), as required by Local Civil Rule 56.1(c) and as discussed in Section I(B), *infra*.  Under the circumstances, the facts summarized in this section are taken from Defendant's Rule 56.1 statement, Plaintiff's opposition affirmation (which was declared to be made under penalty of perjury), and certain evidence in the record, including Plaintiff's deposition testimony.

[2] Although Defendant does not dispute that Plaintiff suffered from these conditions, Defendant argues that they did not render her "disabled" as defined by the relevant statutes.  (*See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated Mar. 24, 2014 ("Def. Mem.") (Dkt. 79), at 10-15.)

cause some of the symptoms she had reported earlier, such as hearing loss, vertigo, and headaches.[3]

Plaintiff began working as a clerical associate in the Records Department of the New York City Office of the Chief Medical Examiner ("OCME") on or about July 7, 2008.  (Def. 56.1 Stmt. ¶ 2.)  From the time she began her employment until approximately February 2009, Plaintiff was supervised by Ashie Henry ("Henry").  (Martin Decl., Ex. B (Transcript of Deposition of Plaintiff, conducted Aug. 15, 2013 ("Pl. Dep.")), at 46:1-17.)  As a clerical associate, Plaintiff's duties included responding to autopsy report requests and subpoenas, which required her to retrieve and photocopy the requested files, as well as to prepare "business record" certifications for subpoenaed files.  (*Id.*, at 44:1-15, 46:7-22.)  She was also required to retrieve files for Henry.  (*Id.*, at 47:23-49:2.)

In her initial meeting with Henry, Plaintiff informed her that she could not climb ladders or lift heavy objects due to her positional vertigo, and Henry told Plaintiff that a college aide could assist Plaintiff in performing those tasks when necessary.  (*Id.*, at 62:19-23.)  Also, due to a hand injury, Plaintiff requested to be allowed to use paper time cards instead of a hand scanner at work, and Defendant approved her request.  (*Id.*, at 62:9-19; Def. 56.1 Stmt. ¶ 11.)  There was little conflict during Plaintiff's first few months of employment with Defendant.  (*See* Pl. Dep., at 110:23-25.)

---

[3] *See* Arachnoid Cysts, Cedars-Sinai, http://www.cedars-sinai.edu/Patients/Health-Conditions/Arachnoid-Cysts.aspx (last visited Nov. 17, 2014) (describing this type of cyst as a sac filled with cerebrospinal fluid, which develops between the brain or spinal cord and the arachnoid membrane, covering the brain and spinal cord).

## 2.     <u>Change in the Work Environment</u>

In or about September 2008, however, Plaintiff's relationship with Henry soured. Around that time, Plaintiff approached Henry with a proposal that, according to Plaintiff, was intended to improve efficiency in the Records Department.  Plaintiff suggested that, when responding to requests from the District Attorney's office, the Records Department send a certified copy of the requested file instead of first sending an uncertified copy and then, upon receipt of a subpoena, sending a certified copy.  (*Id.*, at 97:11-20.)  Plaintiff alleges that Henry not only rejected this suggestion, but responded aggressively, telling her not to "ask any god damn questions," and to "do as [she was] told."  (*Id.*, at 97:21-24.)  Plaintiff then approached individuals in the legal department to share her idea.  (*Id.*, at 97:24-99:17.)  Plaintiff claims that, upon learning that Plaintiff had spoken with staff in the legal department, Henry's demeanor toward Plaintiff "just changed."  (*Id.*, at 100:9.)

Plaintiff contends that Henry became "belligerent[,] unprofessional, discriminatory, [and] abusive."  (Pl. Aff., at 6).[4]  According to Plaintiff, Henry's abusive behavior included cursing at Plaintiff (Pl. Dep., at 97:21-24, 100:7-8), insisting that she complete tasks that were against department protocol (*id.*, at 100:12-101:10), demanding that she review suicide case files for no legitimate reason (Pl. Aff., at 8), referring to her religion (Mormonism) as a cult (Pl. Dep., at 101:17-20), constantly interrupting her work (*id.*, at 103:11-105:6), denying her requests to attend training sessions (*id.*, at 106), and accusing her of "wanting [Henry's] job" (*id.*, at 107:15-17).  On December 1, 2008, Henry also issued a memorandum stating that Plaintiff's attendance and performance were unsatisfactory (Martin Decl., Ex. F), although Plaintiff alleges

---

[4] As Plaintiff's affirmation is comprised of several separate documents, not all of which have their own internal pagination, this Court cites to the page numbers stamped onto the combined document when it was filed on the docket via the Court's electronic case filing system.

4

that Henry made many "false accusations" (Pl. Aff., at 8), particularly regarding Plaintiff's attendance (*see id.*, at 10).

Plaintiff also contends that, although Henry had previously told her that she would not need to climb ladders due to her positional vertigo, Henry began assigning her tasks that required her to do so. (Pl. Aff., at 5; Pl. Dep., at 107:22-109:15.) Plaintiff alleges that, when she protested because of her medical limitations, Henry responded that she was "full of shit" and threatened her with termination for insubordination. (Pl. Dep., at 107:23-108:6.) Plaintiff further alleges that, when she requested the assistance of a college aide to perform tasks she was unable to perform herself, Henry "berated" both Plaintiff (*id.*, at 116:10-19) and the aide who assisted her (*id.*, at 122:11-18). Plaintiff alleges that she complained about Henry's behavior several times, via emails sent to Thomas Lintern ("Lintern"), Henry's supervisor and Deputy Commissioner of Finance and Administration; Ellen Borakove ("Borakove"), OCME Equal Employment Opportunity officer; and Jody Lipton ("Lipton"), an OCME attorney.[5] (Pl. Dep., at 123:1-8.)

In or about February 2009, after Plaintiff made an email complaint against Henry, Defendant assigned Plaintiff a new supervisor, Cynthia Paulin ("Paulin"). (*Id.*, at 147:8-15.) According to Plaintiff, however, Henry continued to act aggressively toward her, and, in one instance, cursed at her and "shoved a folder in [her] chest[,] . . . hit[ting] [her] breast with the folder." (*Id.*, at 147:25-148:21.) Plaintiff alleges that Henry's ongoing antagonistic behavior led to mounting depression. (*Id.*, at 144:6-145:4.) She further alleges that, when she informed

---

[5] Neither Plaintiff nor Defendant provide copies of these emails, and Plaintiff appears to allege that Defendant wrongfully withheld these emails in discovery. (*See* Pl. Aff., at 9-10, and Procedural History, *infra*.) For the purposes of this motion, this Court fully credits Plaintiff's deposition testimony that she made several complaints by email about this conduct.

Henry that she wished to speak with a counselor from the Employee Assistance Program to discuss her depression and anxiety, Henry refused to give her the telephone number. (*Id.*, at 142:11-20.)

### 3.      **Plaintiff's Medical Leave and Subsequent Termination**

On March 27, 2009, Plaintiff claims that she "broke down" at work because she felt that her work environment would never improve. (*Id.*, at 176:13-177:4.) Plaintiff called an Employee Assistance Program counselor, who told her to leave work and go directly to St. Vincent's hospital for treatment. (Def. 56.1 Stmt. ¶ 68.) At St. Vincent's, Plaintiff saw counselors, as well as a psychiatrist, who prescribed her medication. (Pl. Dep., at 179:19-21.) On that day, Plaintiff began an approved medical leave of absence from work. (*Id.*, at 179:24-25.) Once Plaintiff had exhausted her accrued leave, she was given leave without pay. (Def. 56.1 Stmt. ¶ 70.)

Plaintiff alleges that, in March or April 2009, she spoke with Borakove by telephone (Am. Compl. ¶ 65), and that she complained to Borakove about Henry's abusive treatment. (Pl. Dep., at 169:15-19.) According to Plaintiff, Borakove instructed Plaintiff to take the time that she needed away from work to recover, and asked Plaintiff to meet with her in person so that Borakove could prepare a formal complaint against Henry. (*Id.*, at 169:2-11.) Plaintiff further alleges that, while she was on leave, she wrote letters to Assistant Commissioner of Human

Resources Jan English ("English"), expressing her wish to discuss the grievances she had filed against Henry.[6]  (Pl. Dep., at 222:3-22.)

Defendant extended Plaintiff's medical leave five times, upon her submission of doctors' notes indicating that she could not work due to various medical conditions and appointments. (Def. 56.1 Stmt. ¶¶ 72-86; *see* Martin Decl., Exs. Y, AA, CC, FF, HH, JJ (Personnel Action Requests).)  After she had been on leave for four months, however, Defendant informed Plaintiff on Thursday, July 30, 2009, that her leave would expire the following day, and that she was expected to return to work on Monday, August 3, 2009.  (*See* Martin Decl., Ex. KK (Letter to Plaintiff from English, dated July 30, 2009).)  By the same letter, Defendant informed Plaintiff that she would be required to present original medical documentation in order to return to her position.  (*Id.*)

On August 3, Plaintiff emailed her supervisor, Paulin, copying English and Borakove, to inform them that (1) an MRI had revealed a cyst causing migraine headaches and hearing loss, (2) she was unable to wear her hearing aid due to prolonged infections that might require additional surgery, and (3) she had several medical follow-up appointments that she needed to keep.  (*See id.*, Ex. LL (Email to Paulin from Plaintiff, dated Aug. 3, 2009).)  English responded with a request that Plaintiff submit original medical documentation by August 4, 2009, in order to be evaluated for a further extension of medical leave.  (*See id.*, Ex. MM (Email to Plaintiff from English, dated Aug. 3, 2009).)  By a note dated August 5, 2009, Dr. Harold Bendelstein

---

[6] As with Plaintiff's email complaints, discussed *supra* at n.5, neither Plaintiff nor Defendant provide copies of these letters.  For the purposes of this motion, this Court again credits Plaintiff's testimony that she sent them.

requested that Plaintiff be excused from work until August 24, 2009, due to a "severe E.N.T. problem." (*See id.*, Ex. NN.)

By letter dated August 7, 2009, Defendant informed Plaintiff that her request for an extension of medical leave had been denied, and that she "must resolve [her] employment status by August 12, 2009." (*Id.*, Ex. OO (Letter to Plaintiff from Lintern, dated Aug. 7, 2009).) Notwithstanding the written requests of Plaintiff, her counselor, and her physicians for a further extension of medical leave (*see id.*, Exs. N, LL, NN, PP), Defendant terminated Plaintiff's employment on August 14, 2014 (*see id.*, Ex. QQ (Letter to Plaintiff from Lintern, dated Aug. 14, 2009)).

> **B.     Procedural History**

> **1.     Plaintiff's Administrative Complaint**

On June 7, 2010 – 297 days after the termination of her employment – Plaintiff faxed a complaint of discrimination to the United States Equal Employment Opportunity Commission ("EEOC"). (*See* Facsimile to John Douglass, EEOC New York District Office, from Plaintiff, dated June 7, 2010 (*Id.*, Ex. TT).) By letter dated June 8, 2010, the EEOC provided Plaintiff with a Charge of Discrimination containing a summary of her claims, directing her to review and correct the charge as necessary, and then to sign and return it to the EEOC. (*See id.*, Ex. UU (Letter to Plaintiff from Roxanne Zygmund, EEOC Investigator, dated June 8, 2010).) On November 2, 2010, Plaintiff signed the EEOC Charge of Discrimination, alleging discrimination based on disability, which was received by the EEOC the following day. (*See id.*, Ex. VV (Charge of Discrimination, dated Nov. 2, 2010 ("EEOC Charge")).) On June 13, 2011, the EEOC issued Plaintiff a "right to sue" letter. (*See* Pl. Aff., at 45.)

2.      **The Pleadings in this Action**

On September 16, 2011, Plaintiff commenced this action *pro se* by filing a Complaint

(Dkt. 2), along with a request to proceed *in forma pauperis* (Dkt. 1), which was granted (*see*

Dkt. 3).  In her Complaint, Plaintiff alleged that Defendant and Henry violated the ADA, the

NYSHRL, and the NYCHRL, by continuously harassing her, denying her reasonable

accommodations in connection with her disabilities, and eventually terminating her employment

on the basis of disability and in retaliation for complaining of discrimination.  She also asserted a

claim against Defendant and Henry for intentional infliction of emotional distress, under New

York common law.

After retaining counsel (*see* Notice of Appearance, dated Oct. 21, 2011 (Dkt. 10)),

Plaintiff voluntarily dismissed her claims against Henry (*see* Dkts. 17, 18) and subsequently filed

an Amended Complaint (*see* Dkt. 23), which Defendant answered on April 16, 2012 (*see*

Dkt. 24).  Shortly thereafter, however, Plaintiff filed a "Motion to Withdraw Attorney and to

Proceed *Pro Se*" (Dkts. 26, 27), which was granted on June 1, 2012 (*see* Dkt. 25).

On July 27, 2012, again acting *pro se*, Plaintiff filed a motion seeking leave to amend her

pleading further, to include additional factual allegations regarding her medical conditions,

workplace harassment, and her internal and external complaints; to remove certain factual

allegations that Plaintiff claimed were drafted by her former counsel and were inaccurate; and to

add a claim for discrimination on the basis of religion, in violation of Title VII of the Civil

Rights Act, 42 U.S.C. § 2000e *et seq.*  (*See* Dkt. 34.)  Defendant opposed Plaintiff's motion to

the extent that it sought to add a Title VII claim for religious discrimination, arguing that

allowing the proposed new claim would be futile as, according to Defendant, Plaintiff had not

exhausted her administrative remedies with respect to such a claim.  (*See* Dkt. 35.)  By Order

dated March 11, 2013, this Court granted Plaintiff's motion to the extent it sought to add new

factual allegations and drop any prior-asserted claims, but denied it to the extent she sought to

add the religious discrimination claim.  (*See* Dkt. 44.)  Pursuant to this Court's Order, Plaintiff

timely filed a Second Amended Complaint on March 25, 2013 (*see* Am. Compl.), and Defendant

filed its Amended Answer on April 22, 2013 (*see* Dkt. 48).

### 3.  Discovery Disputes

In the ensuing months, discovery became contentious between the parties.  Although this

Court ordered the fact discovery period to close on May 3, 2013 (*see* Scheduling Order, dated

Jan. 10, 2013 (Dkt. 43)), discovery was extended to June 17, 2013 upon Defendant's motion and

Plaintiff's consent (*see* Dkt. 46 (Mem. Endors.)).  At a case management conference held on

June 13, 2013, however, the parties indicated that discovery was not yet complete.  Defendant

alleged that Plaintiff had provided initial disclosures, but had failed to comply with any

discovery requests.  (*See* Transcript of Status Conference Held June 13, 2013 ("June Tr.")

(Dkt. 58), at 20:1-4.)  Plaintiff indicated that she found the discovery process, including

reviewing the emails produced by Defendant, to be "overwhelming" (*see id.*, at 9:10-13), and

also indicated that she believed Defendant's production to be incomplete in that she had sent

letters to Defendant regarding her medical conditions while she was on leave, but these letters

were not included in Defendant's production (*see id.*, at 12:1-12).

As a result of the conference, this Court extended the deadline for discovery to

August 16, 2013, and directed Plaintiff to respond to Defendant's outstanding document requests

and interrogatories by July 12, 2013.  (*See* Scheduling Order, dated June 17, 2013 (Dkt. 50),

¶¶ 1, 3.)  In addition, as Plaintiff had complained that Defendant had produced too many emails

without separating or categorizing them, making it overly burdensome for her to review them

(*see* June Tr., at 9:22-25), this Court further directed Plaintiff to provide Defendant with a list of proposed search terms to narrow Defendant's email production, should she wish to do so (*see* Dkt. 50 ¶ 2).  Finally, the Court instructed Plaintiff that, if, as she had stated at the June 13 conference, she wished to make an application for the Court to request *pro bono* counsel to represent her, she should make a written application.  (*Id.* ¶ 4.)  The Court noted, however, that Plaintiff had previously retained seemingly capable counsel and had sought to discharge that attorney, and thus further instructed Plaintiff that, if she wished to file an application for counsel, she should explain in her application the circumstances that led to her desire to have a different attorney, as well as the extent of any efforts she had made to find new counsel on her own.  (*Id.*)

At a telephonic status conference held on September 4, 2013, the parties again indicated that discovery was not yet complete.  Although, by the date of this conference, Plaintiff had still not provided Defendant with a list of proposed search terms to narrow Defendant's production of emails, the Court discussed this subject with the parties at the conference, and, at Plaintiff's request, directed Defendant to search its emails for certain terms (specified at the conference) related to Plaintiff's alleged harassment.  (*See* Transcript of Telephonic Conference, dated Sept. 4, 2013 ("Sept. Tr.") (Dkt. 60), at 14:12-20:15.)  Plaintiff also indicated, once again, that documents she had previously submitted to Defendant regarding her medical condition, which she believed should have been included in Defendant's production, were not included therein, though she did not provide any specific information as to which documents she believed were missing.  (*See id.*, at 11:17-12:20.)  In response, Defendant asserted that it had produced all of the responsive documents in its possession, including its full EEOC file regarding Plaintiff's claims, as well as her Department of Health and OCME personnel files.  (*See id.*, at 10:18-11:4; 12:12-18.)  Defendant also asserted that Plaintiff still had not responded to its interrogatories,

and that Plaintiff had testified at her deposition that there were responsive documents in her possession – specifically, copies of communications that she had sent to Defendant while she was on medical leave, including medical documentation – that Plaintiff had failed to produce. (*See id.*, at 3:9-4:10, 5:4-6:3.)

On September 9, 2013, in compliance with a request made by the Court during the September 4 conference (*see* Sept. Tr., at 22:22-24:7), Defendant submitted a letter summarizing the resolution of certain discovery issues addressed at the conference, and the status of any issues that remained outstanding (Dkt. 56).  In its letter, Defendant requested that the Court order Plaintiff to comply with her discovery obligations "on notice that a failure to comply . . . will result in the dismissal of her case."  (*See* Dkt. 56, at 2.)  By Order dated October 11, 2013, the Court directed Plaintiff to comply with Defendant's outstanding discovery requests by October 25, 2013, and warned that failure to do so might result in sanctions, including, but not limited to, an order of preclusion or an order preventing Plaintiff from supporting or opposing certain claims or defenses.  (*See* Dkt. 57 (Mem. Endors.).)

By letter motion dated November 7, 2013, Defendant requested a pre-motion conference in anticipation of filing a motion to dismiss based on Plaintiff's "repeated failure to comply with this Court's discovery orders."  (*See* Dkt. 62.)  In response, Plaintiff asserted that she had "provided the Defendant Counsel with all of the evidence that [she had] in [her] possession via United States Postal Service," and further alleged, once again, that Defendant had withheld evidence necessary to the prosecution of her claims, including documents related to her attendance and accrued leave through March 27, 2009, correspondence with Defendant during her medical leave, a copy of Defendant's personnel handbook, and emails requested during the September 4, 2013 telephone conference.  (*See* Dkt. 63.)  In reply, Defendant again denied that it

12

had withheld any evidence, and, further, reiterated its assertion that Plaintiff had failed to comply with her discovery obligations. (*See* Dkt. 65.)

After a case management conference held on November 26, 2013, this Court (1) directed Defendant to provide Plaintiff with another copy of Defendant's previously-served discovery requests, and directed Plaintiff to provide specific responses; (2) directed Plaintiff to supplement her responses should she later locate or acquire any responsive documents that she had not previously produced; (3) directed Defendant to provide Plaintiff with another copy of its responses to Plaintiff's discovery requests, and afforded Plaintiff the opportunity to object, should she believe the responses to be inadequate; and (4) directed Defendant to inquire with third parties as to the availability of documents requested by Plaintiff, but not in Defendant's custody. (Order, dated Nov. 27, 2013 (Dkt. 67).) The Court further provided that, if, after December 13, 2013, either party still believed the other party had failed to comply with its discovery obligations, the aggrieved party could then move for appropriate sanctions. (*Id.* ¶ 5.)

After the issuance of this Order, but before the December 13, 2013 deadline, Plaintiff wrote three letters to this Court, stating that Defendant had continued to withhold documents that were crucial to her case, focusing specifically on her time cards, Defendant's phone records, and correspondence and medical records allegedly sent from Plaintiff to Defendant while she was on medical leave. (*See* Dkts. 68 (regarding time cards and phone records), 69 (same), and 70 (regarding phone records, correspondence, and medical documentation).) Although this Court did not address these letters at the time they were submitted, the Court will assume, for purposes of evaluating Defendant's summary judgment motion, that, where relevant, the documents in question exist, were not produced by Defendant, and that, if they were produced, they would

13

constitute evidence of the facts that Plaintiff contends they would show.[7]  (*See infra* at Sections II(B)(1)(b) and II(B)(4).)

### 4.      **Defendant's Summary Judgment Motion**

Defendant moved for summary judgment on March 24, 2014.  (*See* Notice of Motion for Summary Judgment, dated Mar. 24, 2014 (Dkt. 78); Def. Mem.)  Plaintiff filed an opposition to Plaintiff's motion on July 1, 2014 (*see* Pl. Aff.), after requesting, and receiving from this Court, two extensions of her time to oppose the motion (*see* Dkts. 84-88).[8]  Defendant, after requesting and receiving an extension of time to respond (*see* Dkts. 90, 91), filed a reply on July 25, 2014 (*see* Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, dated July 25, 2014 ("Def. Reply Mem.") (Dkt. 92).)  In their submissions, the parties raise a number of arguments, addressed below.

---

[7] Plaintiff appears to have requested telephone records from Defendant in discovery to support her assertion that she called the Employee Assistance Program on her last day of work, and to have requested her time cards to support her contention that Henry's criticisms of her attendance were unfounded.  (*See* Dkt. 69, at 2.)  As Defendant concedes Plaintiff's first assertion (*see* Def. 56.1 Stmt. ¶ 68), and as the second is not relevant to Defendant's arguments on its motion or to this Court's recommendations, these particular document requests are not discussed further herein.

[8] As Plaintiff, in her first request for an extension of time, continued to assert that Defendant had not complied with its discovery obligations, this Court instructed her as follows: "[I]f [Plaintiff] believes that she cannot respond to Defendant's motion because certain evidence has not been produced in discovery, then she may simply explain this in her opposition papers."  (Order, dated Apr. 21, 2014 (Dkt. 85) (citing Fed. R. Civ. P. 56(d)).)  The Court repeated this in its second grant of an extension, adding, "Plaintiff is again instructed that, if she cannot respond to a particular argument that Defendant is raising in its motion because she did not receive relevant documents [in discovery], then she may, *in her opposition papers*, explain what she believes those documents would show, and why they are necessary for her to respond to Defendant's argument."  (Order, dated May 30, 2014 (Dkt. 88), at 3 (emphasis in original).)

# I.     APPLICABLE SUMMARY JUDGMENT STANDARDS

## A.     Rule 56

A court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Accordingly, the Court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

The party opposing summary judgment may not rely upon the pleadings alone but must instead cite to "particular parts of materials in the record" or show that "the materials cited [by the movant] do not establish the absence . . . of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1).  While the Court must read a *pro se* party's papers liberally "to raise the strongest claims and arguments that they suggest," *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999), even a *pro se* plaintiff cannot defeat a motion for summary judgment by relying only on the pleadings, *see Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996); *see also Belpasso v. Port Auth. of New York and New Jersey*, 400 F. App'x 600, 601 (2d Cir. 2010). Instead, the *pro se* litigant must "present admissible evidence from which a reasonable jury could find in his favor."  *Belpasso*, 400 F. App'x at 601; *see also Jermosen v. Coughlin*, 877 F. Supp.

864, 867 (S.D.N.Y. 1999) (in order to defeat summary judgment, a *pro se* plaintiff must present concrete evidence from which a reasonable jury could return a verdict in his or her favor).

In so doing, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted), but must rather present "significant probative evidence tending to support the complaint," *Smith v. Menifee*, No. 00cv2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (citing *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 290 (1968)). "If the evidence is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

### B.     Local Civil Rule 56.1

Under this Court's rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law.  *Id.*  Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record.  *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Holtz*, 258 F.3d at 74; *Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the material facts contained in the moving party's statement are deemed admitted as a matter of law. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *see also* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").  Where a party is proceeding *pro se*, however, the Court may instead, in its discretion, "conduct an assiduous review of the record," *Holtz*, 258 F.3d at 73 (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)), to ascertain whether there are material disputed issues of fact in the case that would preclude summary judgment.  This Court has done so here.

## II.    PLAINTIFF'S FEDERAL CLAIMS

This Court will first address Plaintiff's federal claims, all of which arise under the ADA.

### A.    Legal Standards under the ADA

Congress enacted the ADA in order to "provide a comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," *id.* § 12101(b)(2).  The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to," *inter alia*, "discharge of employees . . . and other terms, conditions, and privileges of employment." *Id.* § 12112(a).

1.      **Statute of Limitations and Jurisdiction**

As a threshold matter, in order to maintain a suit under the ADA, an aggrieved employee must first file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *Id.* § 12117(a) (incorporating by reference 42 U.S.C. § 2000e-5(e)(1)). If the complaint is dismissed or otherwise fails to result in resolution or suit, the EEOC is then to notify the complainant of his or her right to bring a civil action under the ADA. *Id.* § 12117(a) (incorporating by reference 42 U.S.C. § 2000e-5(f)(1)). The employee then has 90 days to initiate suit. *Id.*

"[I]f a claimant has failed to pursue a given claim in administrative proceedings, the federal court generally lacks jurisdiction to adjudicate that claim." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (citations omitted). Where an aggrieved party does not expressly assert a particular claim in its complaint to the administrative agency, a court has jurisdiction over that claim only where it is "'reasonably related' to those that the plaintiff did assert before the agency." *Id.* A claim is "reasonably related" to an asserted claim where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.*, at 359-60 (internal citation omitted). This requirement is "essentially an allowance of loose pleading," given that "EEOC charges are frequently filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to discrimination that a plaintiff claims she is suffering." *Butts v. City of New York Dept. of Hous. Pres. and Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993), *superseded on other grounds by* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991).

2.      **Definition of "Disability"**[9]

In order to maintain a claim under the ADA, a plaintiff must establish that he or she was

disabled within the meaning of the statute.  Under the ADA, an individual is disabled if he or she

has an actual disability, defined as "a physical or mental impairment that substantially limits one

or more of the major life activities," 42 U.S.C. § 12102(1)(A); *see also*, *Felix v. New York City*

*Transit Auth.*, 324 F.3d 102, 104 (2d Cir. 2003), having a record of such an impairment,

42 U.S.C. § 12102(1)(B), or being "regarded as" disabled, *id.* § 12102(1)(C).

"Major life activities" are those "that are of central importance to daily life."  *Toyota*

*Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by statute on other*

*grounds by* the ADAAA.  These include activities such as "caring for oneself, performing

manual tasks, seeing, hearing, . . . standing, lifting, bending, . . . and working."  42 U.S.C.

§ 12102(2)(A).  In determining whether an impairment "substantially limits" a major life activity

a court may consider factors such as "the nature and severity of the impairment; its duration or

expected duration; and the existence of any actual or expected permanent or long term impact."

*Capiobanco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (citations omitted).[10]

Nonetheless, the "substantial limitation" standard must be "construed broadly in favor of

---

[9] By passing the ADA Amendments Act of 2008 ("ADAAA"), which went into effect on January 1, 2009, Congress significantly broadened the definition of "disability" under the ADA. *See* ADAAA, Pub. L. 110-325, 122 Stat. 3553 (2008).  The definition discussed herein takes the ADAAA into account, as all of the conduct of which Plaintiff complains took place, at least in part, after the ADAAA took effect.

[10] The statute (as amended), dictates, however, that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," 42 U.S.C. § 12102(4)(D), and that the inquiry as to substantial limitation "shall be made without regard to the ameliorative effects of mitigating measures" including, *inter alia*, medication and medical supplies, *id.* § 12102(4)(E)(i).

19

expansive coverage, to the maximum extent permitted by the terms of the ADA" and "is not

meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  "An impairment need not

prevent, or significantly or severely restrict, the individual from performing a major life activity

in order to be considered substantially limiting," although "not every impairment will constitute

a disability" within the meaning of the ADA.  *Id.* at § 1630.2(j)(1)(ii).

An individual is "regarded as" disabled within the meaning of the ADA if he or she "has

been subject to [an adverse action] because of an actual or perceived physical or mental

impairment whether or not the impairment limits or is perceived to limit a major life activity."[11]

42 U.S.C. § 12102(3)(A).  A plaintiff, therefore, is "not required to present evidence of how or to

what degree [his employer] believed the impairment affected him" in order to maintain a claim

under the "regarded as" definition of disability.  *Hilton,* 673 F.3d at 129.

For an employee to be entitled to protection under the ADA, however, that individual

must be otherwise qualified – that is, he or she must be "an individual who, with or without

reasonable accommodation, can perform the essential functions of [the position]."  42 U.S.C.

§ 12111(8).  Thus, an individual who could not perform the essential functions of his or her job

even with reasonable accommodations is not protected by the ADA in the employment context.

### 3.     Types of ADA Employment Claims

#### a.     Failure to Make Reasonable Accommodations

It is impermissible discrimination under the ADA for an employer to fail to "mak[e]

reasonable accommodations to the known physical or mental limitations of an otherwise

---

[11] Prior to the ADAAA taking effect, plaintiffs could only prevail under the "regarded as" prong if they could demonstrate that their employer regarded them "personally as being substantially limited in a major life activity," *Hilton v. Wright,* 673 F.3d 120, 128 (2d. Cir. 2012), but the amendments eliminated this requirement, *id.*, at 128-29; *see* ADAAA §§ 4(a), 8.

qualified individual with a disability who is an applicant or employee," *id.* § 12112(b)(5)(A), although only an individual with an actual disability, as opposed to a perceived disability, is entitled to such accommodations, *id.* § 12201(h).  A plaintiff must demonstrate the following to make a *prima facie* showing of a failure to provide reasonable accommodations:  (1) that he or she is a person with a disability under the meaning of the statute, (2) that an employer covered by the statute had notice of his or her disability, (3) that, with reasonable accommodations, he or she could perform the essential functions of the job at issue (*i.e*, that he or she is a "qualified individual" under the statute), and (4) that the employer has refused to make such accommodations.  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (citing *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).  An employer may escape liability by demonstrating that the requested accommodation would impose "an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A); *see Graves*, 457 F.3d at 184.

The Second Circuit has stated that "[t]he duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover," *Parker v. Columbia Pictures Ind.*, 204 F.3d 326, 338 (2d Cir. 2000), and has "never expressly held that leaves of absence from an employee's job, taken in order to recover from a disability, are 'reasonable accommodations' under the ADA," *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir. 2009) (citations omitted) (summary order).  Assuming that a leave of absence *could* be considered a reasonable accommodation, however, "[the leave] must enable the employee to perform the essential functions of the job . . . at or around the time at which [the leave] is sought."  *Graves*, 353 F. App'x at 560 (citations omitted); *see Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 199

(S.D.N.Y. 1999) (a leave of absence may be "an appropriate form of reasonable accommodation contemplated by the ADA," although a court must analyze the facts of the individual case to determine whether denial of leave constitutes an ADA violation in that instance).

> **b.**     **Hostile Work Environment**

While other federal anti-discrimination statutes recognize a hostile work environment as an actionable adverse employment action, *see*, *e.g.*, *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (Title VII); *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 240-41 (2d Cir. 2007) (Age Discrimination in Employment Act), the Second Circuit has not yet ruled on whether the ADA recognizes such a claim, *see Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) ("Even assuming, *arguendo*, that the ADA provides a basis for a hostile work environment claim (an issue this Court has not yet decided) . . . .").  For the purposes of this motion, this Court assumes, as others have done, that, should a hostile work environment claim be available under the ADA, the same standard would apply as in Title VII cases.  *See*, *e.g.*, *Giambattista v. Am. Airlines*, No. 13cv3608 (ADS) (AKT), 2014 WL 1116894, at *8 (E.D.N.Y. Mar. 20, 2014); *Forgione v. City of New York*, No. 11cv5248 (JG), 2012 WL 4049832, at *7 (E.D.N.Y. Sept. 13, 2012).

Thus, to make a *prima facie* showing of a hostile work environment, a plaintiff would need to point to facts demonstrating that "the complained of conduct (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's disability."  *Giambattista*, 2014 WL 1116894, at *8 (quoting *Patane*, 508 F.3d at 113).  In evaluating the conduct claimed to have created a hostile work environment, a court must take into account the totality of the

circumstances, including "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *accord Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 319 (2d Cir. 1999) (citing *Harris*, 510 U.S. at 23); *Giambattista*, 2014 WL 1116894, at *10. In order to show sufficiently severe or pervasive hostility, a plaintiff must "demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted), *superseded on other grounds by* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 (2005).

### c.      Discriminatory Termination of Employment

As noted above, the ADA makes it unlawful for an employer to discharge an employee because of his or her disability. 42 U.S.C. § 12112(a). In order to establish a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must show that: "(1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation [*i.e.*, that she is a 'qualified individual' under the statute]; and (4) she was fired because of her disability." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998) (citations omitted). "The burden that such a plaintiff must meet in order to defeat summary judgment at the prima facie stage is 'not onerous' and has been described as 'de minimus.'" *Sanzo v. Union Free School Dist.*, 381 F. Supp. 2d 113, 117 (E.D.N.Y. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Upon making this *prima facie* showing, the burden shifts to the employer to rebut the presumption of discrimination "by articulating a legitimate

nondiscriminatory reason for the termination." *Id.* (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999)).  Ultimately, the burden of persuasion "'that the defendant intentionally discriminated against the plaintiff remains at all time [sic] with the plaintiff.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

### d.   Retaliation

The ADA further protects against retaliation by making it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]."  42 U.S.C. § 12203(a).  The Second Circuit has adopted the Title VII burden-shifting approach to evaluating retaliation claims under the ADA.  *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999).  In order to prevail, a plaintiff must establish that "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action."  *Id.*  It is currently an open question in this circuit whether a plaintiff must demonstrate that retaliation was a "but for" cause of the adverse employment action in order to prevail, or whether demonstrating that it was a "motivating factor" is sufficient.  *See Wesley-Dickson v. Warwick Valley Cent. School Dist.*, No. 13cv4164 (JGK), 2014 WL 4958166, at *5 n.3 (2d Cir. Oct. 6, 2014) (summary order).

### B.   Viability of Plaintiff's ADA Claims

In her Second Amended Complaint, Plaintiff alleges that Defendant violated the ADA by denying her reasonable accommodations for her disabilities, creating a hostile work environment, and terminating her employment discriminatorily and in retaliation for complaining

of discriminatory treatment by Henry.  Defendant now moves for summary judgment in its favor on all of these claims.

### 1.    Failure to Make Reasonable Accommodations

#### a.    Climbing Ladders

In her Second Amended Complaint, Plaintiff alleges that, while Defendant initially accommodated her positional vertigo by allowing her to obtain assistance if a task required climbing ladders or lifting heavy objects, around September 2008, Henry began "forcing Plaintiff to climb ladders to search for files."  (*See* Am. Compl. ¶¶ 23-24, 28-29.)  In her deposition, Plaintiff further explained that Henry began assigning her tasks that required her to climb ladders, threatened her with insubordination when she protested, and "berated" Plaintiff and the aide who assisted her when Plaintiff asked for help retrieving files located on high shelves.  (Pl. Dep., at 107:22-109:15; 116:10-19; 122:11-18.)  In its motion, Defendant argues that Plaintiff's ADA claim regarding positional vertigo is time-barred, as more than 300 days elapsed between the complained-of conduct and the date of Plaintiff's EEOC charge, and further argues that positional vertigo is not a disability under the ADA.  (Def. Mem., at 8-11.)  Plaintiff does not address either argument directly, but instead argues generally that the accommodation "should have remained in effect from the beginning of employment throughout," and that she was disabled within the meaning of the ADA, although she focuses primarily on her depression and anxiety.  (*See* Pl. Aff., at 5.)

This Court agrees with Defendant that Plaintiff's claim that Defendant revoked her reasonable accommodation for positional vertigo, in violation of the ADA, is time-barred. Plaintiff alleges that the accommodation was initially revoked around September 2008, but has not alleged any specific dates thereafter on which she requested the accommodation and was

denied.[12]  Drawing all reasonable inferences in favor of Plaintiff, this Court assumes, for the purposes of this motion, that Plaintiff made such a request and was denied as late as March 27, 2009, the last day on which Plaintiff reported to work.  Plaintiff, however, did not file her charge with the EEOC until June 7, 2010 – 437 days later.  As her charge was filed well over 300 days from the latest possible date that Defendant could have denied her request for accommodation of her positional vertigo, this claim is time-barred under the ADA.

While the doctrine of "equitable tolling" can apply to the 300-day deadline (potentially allowing a court to consider claims that were not timely raised before the EEOC), *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), equitable tolling is only appropriate in "rare and exceptional circumstances . . . in which a party is prevented in some extraordinary way from exercising his rights," *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (internal quotation marks and citations omitted).  Here, Plaintiff has not specifically argued that equitable tolling should apply, and although the record demonstrates that Plaintiff was ill during her medical leave of absence, the evidence is insufficient for this Court to conclude that illness or anything else actually prevented Plaintiff from exercising her rights for the entire 300-day period in question.  Accordingly, this Court recommends that Defendant's

---

[12] The rejection of a proposed accommodation is considered "a single completed action when taken," such that the statute of limitations begins running when the accommodation is denied, even when "the effect of the employer's rejection continues to be felt by the employee for as long as he remains employed." *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003) (citations omitted) (considering issue in Title VII context).  Where, however, an employee makes a subsequent request for an accommodation and it is again denied, this Court has found this to constitute a separate employment practice, subject to a renewed limitations period. *See Fol v. City of New York*, No. 01cv1115 (THK), 2003 WL 21556938, at *5 (S.D.N.Y. July 9, 2003).  In this case, based on Plaintiff's testimony that she protested Henry's assignments requiring her to climb ladders, a jury could find that Plaintiff renewed her request for an accommodation for her medical needs, after it was initially denied.  Although Plaintiff does not assign dates to any such subsequent requests, this Court assumes, for the purposes of this motion, the latest date consistent with her testimony.

motion be granted with respect to Plaintiff's ADA claim for failure to accommodate her

positional vertigo.

### b.   <u>Extension of Medical Leave</u>

Plaintiff also claims that Defendant failed to provide the reasonable accommodation of

extending her medical leave.  In its motion, Defendant argues that its denial of Plaintiff's request

for an extension of leave did not violate the ADA because (1) Plaintiff was not "disabled" within

the meaning of the ADA when she requested her last two-week extension of medical leave,

(2) Defendant did not have notice of Plaintiff's alleged disability at the time she was terminated,

and (3) Plaintiff was not a "qualified individual" within the meaning of the ADA because there is

no evidence that, even with a further extension of her medical leave, Defendant would have been

able to return to work.  (Def. Mem., at 12-18.)  In response to these points, Plaintiff contends that

(1) she was suffering from depression at the time she requested a final two-week extension of her

medical leave for psychiatric reasons, (2) Defendant had notice of her stress, anxiety, migraines,

and depression, and (3) she "wanted to go back to work with support and protection from

ongoing abuse."[13]  (Pl. Aff., at 5-7.)  This Court finds persuasive Defendants' third argument:

that there is no genuine factual question here as to whether Plaintiff was a "qualified individual"

---

[13] Plaintiff also argues that, under *Phillips v. City of New York*, 884 N.Y.S.2d 369 (1st Dep't 2009), *rejected in part by Jacobsen v. New York City Health & Hosp. Corp.*, 22 N.Y.3d 824, 837 (2014), City employees are entitled to one year of medical leave.  The *Phillips* court, however, did not decide this issue.  Instead, the Appellate Division in *Phillips* held that the NYSHRL and NYCHRL require an employer to "engage in a good faith interactive process" to assess the needs of a disabled employee and the reasonableness of the accommodation requested. *Id.*, at 373.  While the lack of such a process may bolster Plaintiff's state and city law claims, the New York Court of Appeals has since clarified that the lack of such a process does not "automatically compel[] a grant of summary judgment to the employee or a verdict in the employee's favor."  *Jacobsen*, 22 N.Y.3d at 837.

within the meaning of the ADA, such that Defendant was required to grant, as a reasonable accommodation, a further extension of medical leave.

In *Graves v. Finch Pruyn & Co.*, the Second Circuit addressed whether an employer violated the ADA where it terminated the employment of an employee who had exhausted disability leave and had requested additional unpaid leave to consult a foot specialist about his bone spurs, which were preventing him from returning to work.  457 F.3d 181 (2006) ("*Graves I*").  There, the circuit reversed the district court's initial grant of summary judgment against the employee, finding that the district court had erred in finding the employee's request to be for indefinite leave, as opposed to leave for a particular period of time.  *Id.*, at 185.  The circuit court, however, explicitly left open the question of "how assured the employer must be of an employee's successful return following a proposed finite leave of absence in order for the finite leave to be a reasonable accommodation."  *Id.*, at 186 n.6.  After remand, upon which the district court again granted summary judgment in the defendant employer's favor, the Second Circuit ultimately affirmed that grant, finding that the plaintiff "had made no showing that [the employer] at the time of the request *had any assurance whatsoever* that the accommodation would allow [the employee] to perform the essential functions of his job."  *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 561 (2d Cir. 2009) (emphasis added) (summary order) ("*Graves II*").  In so deciding, the Second Circuit found that the employee's physician's statements that consulting with a specialist "might in general be helpful" were insufficient to enable the plaintiff to survive summary judgment.  *Id.*

This Court concludes that, much like the plaintiff in *Graves II*, Plaintiff here has produced no evidence upon which a reasonable jury could find that Defendant had any assurance that the requested leave would have enabled her to return to work, and thus no question of fact

28

exists as to whether the ADA required Defendant to extend Plaintiff's medical leave.  Neither Plaintiff's own communications with Defendant around the time she made her sixth request for an extension of medical leave, nor her doctors' communications with Defendant around that time, provide any evidence that might support a finding that Plaintiff would have been able to return to work at the end of the proposed leave period.[14]

First, in Plaintiff's email to Paulin, English, and Borakove, dated August 3, 2014, Plaintiff stated that testing had "revealed a posterior fossa arachnoid cyst in [her] brain which [was] causing the severe migraine[s] and hearing loss in [her] left ear," that she was unable to wear her hearing aid due to "severe prolonged infections," and that she "may require additional surgery to alleviate symptoms."  (Martin Decl., Ex. LL.)  Second, the doctor's note that Plaintiff provided in support of her request for a sixth extension of leave did not address Plaintiff's prognosis or whether she would likely be able to return to work at the expiration of the extended leave, instead noting that Plaintiff would "continue evaluation."[15]  (*Id.*, Ex. NN (Note from Dr. Harold L. Bendelstien re: Plaintiff, dated Aug. 5, 2009).)  Finally, the letter from Plaintiff's primary care physician, submitted after Plaintiff's employment was terminated, explained that Plaintiff needed additional time off because "[f]ollow-up testing and examinations by ENT Specialist and Nuerological [sic] Specialist [are] needed as well as further counseling services," that Plaintiff "[was] not medically cleared to return to work," and that Plaintiff had follow-up

---

[14] Plaintiff's assertion in opposition to Defendant's motion that she "wanted to go back to work" does not address whether she would, in fact, have been able to do so.  (*See* Pl. Aff., at 7.)

[15] The note reads, in full: "The above patient is being treated for a severe E.N.T. problem.  Please excuse till 8/24/09.  She will continue evaluation."  (*Id.*, Ex. NN.)

appointments scheduled.  (*Id.*, Ex. PP (Letter To Whom It May Concern from Dr. Emmanuel Decade, dated Aug. 11, 2009)).)

As in *Graves II*, Plaintiff's physicians' opinions addressed only whether the two weeks of additional leave that Plaintiff sought might have benefited Plaintiff, but not whether additional leave would have enabled her to return to work.  Even according Plaintiff the benefit of every reasonable inference, none of this correspondence provided any assurance to Defendant that Plaintiff would have been able to return to work at the end of the requested leave, and indeed the correspondence appears to demonstrate that Plaintiff and her doctors were contemplating lengthy or ongoing treatment.[16]

As Plaintiff has provided no evidence from which a reasonable jury could find that a sixth extension of medical leave would have allowed her to return to work, this Court recommends that Defendant's motion be granted with respect to Plaintiff's claim that, by denying her last request for medical leave, Defendant failed to afford her a reasonable accommodation.

## 2.   **Hostile Work Environment**

Plaintiff also alleges that Henry's allegedly abusive conduct created a hostile work environment, in violation of the ADA.  (*See* Am. Compl. ¶ 89.)  In its motion, Defendant argues

---

[16] Although Plaintiff alleges that Defendant has not produced, in discovery, medical documentation that she sent Defendant while on medical leave, Plaintiff asserts that this documentation would establish that her condition was *worse* than Defendant acknowledges (*see* Dkt. 70, at 2 ("[Defendant is] pretending that I had an ear infection or the flu and ignoring letters and diagnosis they received.")), and that it would establish that she also needed an extension of leave due to her depression and anxiety (*see* Pl. Aff., at 5 ("[Defendant] received documents regarding depression [and] [r]equest for extension [of leave] for psychiatric reasons.")).  Thus, assuming the documentation exists and would demonstrate these facts, it would not appear to support the conclusion that an additional short leave would have enabled Plaintiff to return to work.

that Plaintiff's allegations as to Henry's conduct "do not meet[] the high burden necessary to establish the severe and pervasive conduct necessary to establish a hostile work environment" (Def. Mem., at 20), and further argues that Plaintiff "has not adduced any evidence that the alleged workplace hostility occurred because of her alleged disabilities." (Def. Reply Mem., at 5). In her opposition, Plaintiff reiterates that Henry's conduct was abusive (Pl. Aff., at 7-8), but does not specifically address the issue of causation.

Regardless of whether Plaintiff could demonstrate that (a) Henry's alleged conduct was so abusive that it could be said to have created a hostile work environment, and (b) the hostility Plaintiff claims to have experienced was engendered by any disability or perceived disability, Plaintiff's hostile-work-environment claim is time-barred, and, therefore, the Court need not address its merits. While Defendant does not, in its motion, make this argument, Defendant did raise a statute of limitations defense in its Amended Answer (*see* Dkt. 48 ¶ 105), and this Court may *sua sponte* dismiss a claim on limitations grounds where "the facts supporting the statute of limitations defense are set forth in the papers plaintiff [her]self submitted," *Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) (citations omitted).

Plaintiff's hostile work environment claim is based entirely on Henry's allegedly abusive conduct. (Pl. Aff., at 7-8.) As discussed above, however (*see* Section III(B)(1)(a), *supra*), all of Henry's conduct allegedly abusive conduct occurred well over 300 days before Plaintiff filed the EEOC Charge. The Supreme Court has found a hostile work environment to be a "single unlawful employment practice" and has held that "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period," so long as "*an act contributing to the claim* occur[red] within the filing period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (emphasis added). In

31

discussing the application of this holding, the Court stated that a later act could not be considered "an act contributing to the claim" – and therefore would not bring other earlier acts within the limitations period – where the later act had "no relation" to the earlier acts, or where, "for some other reason, such as certain intervening action by the employer," the later act "was no longer part of the same hostile work environment claim." *Id.* at 118. The Second Circuit has interpreted *Morgan* to require "courts to make an individualized assessment of whether incidents and episodes are related," while noting that *Morgan* "does not limit the relevant criteria, or set out factors or prongs." *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 77 (2d Cir. 2010) (finding that a later-made offensive comment did not contribute a prior hostile work environment where the comment was made after the plaintiff's transfer to a different department, and differed from previously-made comments in both content and context).

In this case, not only does all of Henry's conduct fall outside of the 300-day limitations period, but, given that Plaintiff filed the EEOC Charge 297 days after Defendant terminated her employment, the only one of Defendant's challenged acts that falls within the 300-day period is the termination itself. By the time Defendant terminated Plaintiff's employment, the circumstances of her employment had shifted significantly, as Plaintiff no longer reported to Henry, and had been on medical leave for over four months. In addition, the act of terminating Plaintiff's employment did not resemble, in quality, the types of abusive acts that Plaintiff claims were committed by Henry. Under the circumstances, the termination of Plaintiff's employment is best viewed as a discrete act, unrelated to Henry's allegedly abusive behavior, such that it did not "contribut[e] to" the hostile environment alleged by Plaintiff. *Morgan*, 536 U.S. at 117; *see also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (affirming grant of summary judgment on statute of limitations grounds where "the only allegedly discriminatory act

of which [the plaintiff] complained that occurred within the 300-day period was the termination of his employment[,] [and he] offered no evidence to show that the termination, even if discriminatory, was in furtherance of the alleged practice of racial harassment").

Accordingly, this Court recommends that Defendant's motion be granted with respect to Plaintiff's hostile work environment claim under the ADA, on the ground that this claim is time-barred.

### 3.    Discriminatory Termination of Employment

In her Second Amended Complaint, Plaintiff further alleges that Defendant terminated her employment because of her disabilities, in violation of the ADA.  (*See* Am. Compl. ¶ 90.) Neither Plaintiff nor Defendant addresses this claim independently, although Defendant appears to treat it simultaneously with Plaintiff's claim that Defendant violated the ADA's reasonable accommodation requirement by denying Plaintiff's request for an extension of medical leave. (*See* Def. Mem., at 12-17.)  As set out above, making a *prima facie* showing of discriminatory termination of employment requires the employee to demonstrate that she could perform the essential functions of her job with or without reasonable accommodation.  *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998) (citations omitted).  Here, as already discussed in connection with Plaintiff's claim for failure to accommodate, there is no evidence in the record that could enable a reasonable jury to conclude that Plaintiff was able to work, or would have been able to do so with a further, finite extension of her medical leave.  For this reason, this Court not only recommends dismissal of Plaintiff's failure-to-accommodate claim, but also her discriminatory termination claim.

4.    **Retaliatory Discharge**[17]

As an initial matter, Defendant challenges this Court's jurisdiction over Plaintiff's ADA retaliation claim, contending it was not first raised in her EEOC complaint.  As discussed above, a court has jurisdiction over a claim not expressly raised in a plaintiff's EEOC complaint where such claim is "'reasonably related' to those that the plaintiff did assert before the agency," meaning that "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001) (citations omitted).  Defendant argues that, because Plaintiff did not check the "retaliation" box in her EEOC Charge, she has not exhausted her administrative remedies as to that claim.  (Def. Mem., at 6-8.)  In response, Plaintiff argues that she exhausted her remedies because she "brought up *everything* to [the] EEOC."  (Pl. Aff., at 4 (emphasis in original).)

While Plaintiff checked only the "disability" box on the EEOC Charge and failed to check "retaliation," she alleged sufficient facts regarding retaliation to raise this claim before the EEOC and thus to place it within the jurisdiction of this Court.  In the EEOC Charge, Plaintiff alleged that "[b]eginning in September 2008, [she] made several complaints via email and via telephone conversations of ongoing harassment and failure to make reasonable accommodations due to [her] disabilities," and that Defendant violated the ADA by "terminat[ing] [her] employment for failing to give [her] a reasonable accommodation due to [her] disabilities." (EEOC Charge, at 2.)  Although Plaintiff did not specifically allege a retaliatory motive, the

---

[17] To the extent Plaintiff alleges that her complaints about Henry led Henry to retaliate against her by subjecting her to harsher treatment in the workplace, any retaliation claim based on such allegations would be time-barred, for the same reasons discussed above, in connection with Plaintiff's other claims centering on how Henry treated her on the job.  (*See supra* at Sections II(B)(1)(a) and II(B)(2).)

EEOC investigation that could have reasonably been expected to grow from Plaintiff's charge would have encompassed the complaints allegedly made by Plaintiff and the circumstances surrounding her ultimate termination – in other words, all of the relevant facts related to Plaintiff's retaliation claim.

Accordingly, Plaintiff's claim for retaliatory discharge was reasonably related to the claims expressly raised in her EEOC Charge. *Compare Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008) (finding that the plaintiff failed to exhaust administrative remedies with respect to hostile work environment claim where the administrative complaint "contains no reference to repeated conduct or the cumulative effect of individual acts [and] recounts nothing more than a single act of physical and verbal abuse"), and *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 183 (S.D.N.Y. 2009) ("[T]he mere fact that [the plaintiff's] name may appear to be a Muslim name, and that it was listed on his administrative complaint, was insufficient to give the EEOC adequate notice to investigate a claim of religious discrimination."), *with Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 439 (E.D.N.Y. 2010) (finding plaintiff who did not check the "retaliation" box on her administrative complaint nonetheless exhausted administrative remedies with respect to retaliation claim where the complaint contained allegations that, after attempting to discuss an instance of perceived disparate treatment, she was fired), *and Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998) ("We find [the plaintiff's] disparate impact claim reasonably related to her failure to promote claim as we would expect that the EEOC, in investigating the complaint, would have assessed [the defendant employer's] promotion policies and their effect on minority employees.").  Finding Plaintiff to have exhausted her administrative remedies with respect to retaliatory termination, this Court now turns to the merits of her claim.

Defendant argues that there is no evidence in the record of a causal connection between Plaintiff's alleged protected activity and the termination of her employment, and that summary judgment must therefore be granted in its favor on Plaintiff's retaliation claim.  (Def. Mem., at 21-23.)  In response, Plaintiff argues that there *is* evidence of a causal connection because, "[a]fter [she] asked to come back to meet with [Borakove], [she] was fired" (Pl. Aff., at 6), apparently relying on the temporal proximity of these events to give rise to an inference of a causation.

Plaintiff, though, alleges that she made several complaints to Defendant regarding Henry's abusive behavior over the course of her employment, as follows:[18]

> (1)   from September 2008 through August 2009, Plaintiff sent several email complaints to Lintern, Borakove, and Lipton, regarding Henry's "discrimination, harassment, [and] workplace interference" (Pl. Dep., at 123:1-8);
>
> (2)   around December 2008, Plaintiff sent an email to Mairs, complaining that Henry had berated the college aide who helped Plaintiff retrieve files located on high shelves (*see id.*, at 122:22-123:1);
>
> (3)   on March 3, 2009, Plaintiff sent an email to Mairs, stating that Henry had been a "nightmare" since September 2008 and that Henry was "always picking [on Plaintiff]," and Mairs forwarded this email to Lintern and Lipton (Martin Decl., Ex. I);
>
> (4)   on March 19, 2009, Plaintiff sent an email to Lipton, stating that Henry had made an "insulting" remark about Plaintiff, which Plaintiff had overheard, and that Henry's behavior was "unsettling, insinuating, and odd at times" (*Id.*, Ex. C);

---

[18] In order to give Plaintiff the benefit of the doubt regarding the adequacy of Defendant's document production, this list includes complaints referred to by Plaintiff in her deposition testimony, even where her assertions are not supported by documentary evidence contained in the discovery record.  (*See supra* at n.5 and n.6.)

     (5)     shortly after her last day of work (which was on March 27, 2009), Plaintiff spoke with Borakove about Plaintiff's leave and about making a complaint regarding Henry's conduct (Pl. Dep., at 169:1-13);

     (6)     on March 29, 2009, Plaintiff sent an email to Borakove, stating that Plaintiff looked forward to the opportunity to speak in the future, and noting that Henry had "said insulting things" to Plaintiff (Martin Decl., Ex. L);

     (7)     while Plaintiff was on medical leave, she sent multiple letters to English requesting to meet with English upon Plaintiff's return to work, so as to follow up on a complaint against Henry (Pl. Dep., at 222:3-12, 224:12-13; *see* Martin Decl., Ex. WW); and

     (8)     on August 12, 2009, Plaintiff sent an email to Lintern noting that, over the course of her employment, Plaintiff had "reached out to various staff members regarding [Henry's] behavior, disorganization, harassment and her constant insults [regarding Plaintiff's religion, disability, and loss of hearing]." (Martin Decl., Ex. M.)

Even viewing this evidence in the light most favorable to Plaintiff, this Court finds that it would be unreasonable to infer, based solely on the temporal proximity between the last of Plaintiff's complaints (made while she was on medical leave) and the termination of her employment, that Defendant terminated Plaintiff's employment as a result of these complaints. Against the backdrop of the many complaints that Plaintiff allegedly made from September 2008 through the time of her termination in August 2009 – nearly the entire time that she was employed by Defendant – a reasonable jury could not find, without more, that Defendant terminated Plaintiff's employment because of these complaints. *See McCullough v. Wyandanch Union Free School Dist.*, 187 F.3d 272, 280 ("[I]t is undisputed that . . . appellee engaged in the speech over the entire course of his employment, not merely prior to the negative evaluation. These facts render unremarkable any temporal connection between any particular speech by appellee and the negative evaluation."). Furthermore, this Court finds no other evidence in the

record which might support a causal link between her ongoing complaints and the termination of her employment.

Accordingly, this Court recommends that Defendants' motion be granted with respect to Plaintiff's ADA claim for retaliatory discharge.

## III.     **SUPPLEMENTAL JURISDICTION**

Based on the foregoing, this Court recommends that Defendant's motion be granted with respect to all of Plaintiff's claims under the ADA, the only federal claims at issue in this case. Where all federal claims are dismissed, a district court has discretion to retain supplemental jurisdiction over any pendent state law claims. *See* 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *see also Tojzan v. New York Presbyterian Hosp.*, No. 00cv6105 (WHP), 2003 WL 1738993, at *9 (S.D.N.Y. Mar. 31, 2003) (in disability discrimination case, acknowledging court's discretion to retain pendent NYSHRL claims, but declining to retain jurisdiction over those claims after dismissing ADA claims).

Here, while this case has been pending in this Court for a significant period of time, much of the delay in reaching this juncture was caused by the parties' repeated requests for extensions, as opposed to the complexity of the case. *See Chenensky v. New York Life Ins. Co.*, 942 F. Supp. 2d 388, 393 (declining to exercise supplemental jurisdiction despite the fact that the case had been pending for over five years). In addition, although Plaintiff's state and city law claims arise

generally from the same set of facts as her federal claims, the legal frameworks under which a court must evaluate the state and city laws at issue diverge, often substantially, from those governing ADA claims.  For example, while this Court has recommended finding that at least two of Plaintiff's ADA claims are time-barred for failure to raise them in an EEOC Charge within 300 days of their accrual, both the NYSHRL and NYCHRL have three-year statutes of limitations, and neither requires the filing of an administrative complaint prior to initiating a lawsuit.  *See Martinez-Tolentino v. Buffalo State Coll.*, 715 N.Y.S.2d 554, 555 (4th Dep't 2000) (applying three-year statute of limitations for statutorily created causes of action under C.P.L.R. § 214(2) to NYSHRL claims); N.Y.C. Code § 8-502(d) (three year statute of limitations for NYCHRL claims).  Furthermore, the definition of "disability" is broader under both the NYSHRL and NYCHRL than under the ADA.  *See* N.Y. Exec. L. § 292(21) (defining disability under the NYSHRL as a "physical, mental or medical impairment," without regard to whether or to what degree the impairment limits any major life activities); N.Y.C. Code § 8-102(16)(a) (defining "disability" under the NYCHRL as "any physical, medical, mental or psychological impairment").  Finally, given the 2005 amendments requiring broad construction of the NYCHRL, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2013).

Under these circumstances, where Plaintiff's state and city law claims require separate analyses from her federal claims, the Court's retention of jurisdiction would not significantly conserve judicial resources.  Moreover, given the divergent legal frameworks, principles of comity weigh heavily against retaining jurisdiction.  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for

them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Under these circumstances, it would seem that applying state and city law to the facts of Plaintiff's claims would be "a question best left to the courts of the State of New York." *Tojzan*, 2003 WL 1738993 at *9; *see also Jacobsen v. New York City Health & Hosp. Corp.*, 22 N.Y.3d 824, 837 (2014) (articulating standards for evaluation of disability discrimination claims under the NYSHRL and NYCHRL).

In sum, "where Plaintiff appears to be asserting state and local law claims that are not entirely coextensive with federal claims that the Court has analyzed and rejected on the merits," the most appropriate course of action would be for the Court to decline to exercise supplemental jurisdiction and to dismiss those claims, without prejudice to Plaintiff's pursuing them, as appropriate, in state court. *Uddin v. City of New York*, No. 07cv1356 (PAC) (DF), 2009 WL 2496270, at *27 (S.D.N.Y. Aug. 13, 2009). Accordingly, this Court recommends dismissal of Plaintiff's claims under the NYSHRL, NYCHRL, and New York common law, without prejudice to her filing these claims in state court.[19]

## CONCLUSION

For the foregoing reasons, I recommend that Defendant's motion for summary judgment (Dkt. 78) be granted, with prejudice, with respect to all of Plaintiff's ADA claims. I further recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's claims brought under the NYSHRL, the NYCHRL, and New York common law, and I therefore recommend that those state and local claims be dismissed without prejudice to Plaintiff's refiling them in state court.

---

[19] Under 28 U.S.C. § 1367(d), the statute of limitations to bring these claims in state court would be tolled for the period from the date when Plaintiff first asserted the claims in this Court to 30 days after the Court's dismissal of this action.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Katherine P. Failla, United States Courthouse, 500 Pearl Street, Room 2103, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Failla. As Plaintiff is proceeding in this action *pro se*, any submissions she makes to the Court (including any objections to this Report and Recommendation for filing, any courtesy copies for judges' chambers, and any requests for extensions of time) should be mailed or otherwise delivered by her to the Court's *Pro Se* Office. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Plaintiff does not have access to cases cited herein that are reported only on Westlaw or other computerized databases, she may request copies from Defendant's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases

and other authorities . . . that are unpublished or reported exclusively on computerized databases]

as are cited in a decision of the Court and were not previously cited by any party.").

Dated:  New York, New York
        November 25, 2014

                                        Respectfully submitted,


                                        _____
                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

The Honorable Katherine P. Failla, U.S.D.J.

Ms. Liza Hernandez
32-63 45th Street
Queens, New York 11103

Defense counsel (via ECF)


┌─────────────────────────────────────────────────┐

*A copy of this Order was mailed by Chambers to:*


        Ms. Liza Hernandez
        32-63 45th Street
        Queens, New York 11103

└─────────────────────────────────────────────────┘